Maureen R. Graves, Esq. (SBN 145979)
John G. Nolte, Esq. (SBN 233966)
34 Schubert Court
Irvine, CA 92617
Phone: 949-856-0128
Fax: 949-856-0168
maureen@maureengraves.com
john@maureengraves.com

Attorney for Plaintiffs
KA.D., a minor, by her mother,
KY.D., as her next friend;
KY.D.; and B.D.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KA.D., a minor, by her mother, KY.D., as her next friend; KY.D.; and B.D.;<br><br>Plaintiffs,<br><br>vs.<br><br>SOLANA BEACH SCHOOL DISTRICT,<br><br>Defendant. | Civil No.   08-cv-00622-W (POR)<br><br>NOTICE OF MOTION AND MOTION FOR PARTIAL REVERSAL OF OAH DECISION<br><br>Hearing Date: June 29, 2009<br>NO ORAL ARGUMENT<br>pursuant to Local Rule 7.1(d)(1) |
| SOLANA BEACH SCHOOL DISTRICT<br><br>Counterclaimant,<br><br>vs.<br><br>KA.D., a minor, by her mother, KY.D., as her next friend; KY.D.; and B.D.;<br><br>Counter Defendants. | |

Plaintiffs and  Counter Defendants KA.,D., by  her guardian ad litem KY.D., KY.D. and B.D. hereby move this Court for an order reversing portions of a decision by the California Office of Administrative Hearings which: 1) Failed to identify unlawful predetermination in the formulation of KA.'s Individualized  Education Program for the 2007-08 school year; 2) Failed to order SBSD

1   to fund to any extent an Independent Educational Evaluation by Dr. Caroline Bailey which they

2   obtained for purposes of educational planning and being able to prove their case in the underlying

3   administrative action; 3) Forced KA.'s parents to absorb the costs associated with keeping her

4   preschool inclusion program going during the period between OAH's order and the time, 30 days

5   later, when it took effect; and 4) Denied compensation for KA.'s mother's work as a behavioral

6   therapist in keeping KA.'s in-home program in operation during a period in which the District

7   denied funding for that program.

8   Respectfully submitted,

9

10   DATED: 27 April 2009          /S/MAUREEN GRAVES, ESQ.
                                   Maureen Graves, Esq.
11                                 Attorney for Plaintiffs
                                   KA.D., a minor, by her mother, KY.D., as her next f riend;
12                                 KY.D.; and B.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Maureen R. Graves, Esq. (SBN 145979)
John G. Nolte, Esq. (SBN 233966)
34 Schubert Court
Irvine, CA 92617
Phone: 949-856-0128
Fax: 949-856-0168
maureen@maureengraves.com
john@maureengraves.com

Attorney for Plaintiffs
KA.D., a minor, by her mother,
KY.D., as her next friend;
KY.D.; and B.D.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KA.D., a minor, by her mother, KY.D., as her next friend; KY.D.; and B.D.;<br><br>                                    Plaintiffs,<br><br>vs.<br><br>SOLANA BEACH SCHOOL DISTRICT,<br><br>                                    Defendant. | Civil No.   08-cv-00622-W (POR)<br><br>PLAINTIFFS' REQUEST THAT ADMINISTRATIVE DECISION BE IN PART SUSTAINED AND IN PART REVERSED<br><br>Hearing Date: June 29, 2009<br>NO ORAL ARGUMENT<br>pursuant to Local Rule 7.1(d)(1) |
| SOLANA BEACH SCHOOL DISTRICT<br><br>                                    Counterclaimant,<br><br>vs.<br><br>KA.D., a minor, by her mother, KY.D., as her next friend; KY.D.; and B.D.;<br><br>                                    Counter Defendants. | |

i                                                    08-cv-00622-W (POR)

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Oregon*, 195 F.3d 1141, 1150 (9th Cir. 1999)........................................21

*Amanda J. v. Clark Co. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)................8

*Arlington v. Murphy*, 548 U.S. 291 (2006) ........................................13, 21

*A.S. v. Norwalk Board of Educ.*, 183 F.Supp.2d 534 (D. Ct. 2002) ..................16

*Bucks County Dept. of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61 (3d Cir. 2004)..............................................23

*Deal v. Hamilton Co. Bd. of Educ.*, 392 F.3d 840, 855-59 (6th Cir. 2005), *cert. denied*, 546 U.S. 936 (2005) ..............................................8

*Florence County School District Four v. Carter*, 510 U.S. 7 (1993) ..................4

*Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982) ..........8

*Hurry v. Jones*, 734 F.2d 879 (1st Cir. 1984) ..............................................23

*Sacramento City Unif. Sch. Dist. V. Rachel Holland.*, 14 F.3d 1398, 1404 (9th Cir.), *cert. denied*, 512 U.S. 1207 (1994)..............................................4, 10

*Schaffer v. Weast* 546 U.S. 49 (2005)................................................7, 13, 21

*Straube v. Florida Union Free Sch. Dist.*, 801 F. Supp. 1164 (S.D.N.Y. 1992) ................23

*W.G. v. Target Range Sch. Dist.*, 960 F.2d 1479, 1484-85 (9th Cir. 1992)..........8

**Administrative Decisions**

*Montgomery County Pub. Sch.*, 40 IDELR 59 (Maryland SEA 2003) ................19

*Parents v. Modesto City Schools*, OAH Nos. 20090300737 & 2008040702 (2008)...........8, 16

*San Luis Coastal Unif. Sch. Dist. v. Benjamin L.*, OAH No. N2005080655, at 15-16 (2005), *partially reversed on other grounds sub nom. B.L. v. San Luis Coastal Sch. Dist.*, CV 06-1747 (2007) ..............................................16

*Val Verde Unif. Sch. Dist. v. Parents*, OAH Case No. 2008030801 (2008)........................14, 17

**California Education Code**

56302.5 ..............................................14

56320 ..............................................14, 16

56327 ..............................................14

56441.4 ..............................................2

**Federal Statutes and Regulatons**

20 U.S.C. 1415(b)(1) ..............................................12

20 U.S.C. 1415(b)(2) ..............................................14

20 U.S.C. 1415(d)(2)(A)..............................................12

20 U.S.C. § 1414(d)(1)(A)(i)(IV) ..............................................15

20 U.S.C. 1414(d)(3)(A)(i) ..............................................15

34 C.F.R. § 300.502 ..............................................12, 19

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ....................................................................................... ii

3

TABLE OF CONTENTS............................................................................................. iii

4

FACTUAL BACKGROUND...................................................................................... 1

5

LEGAL BACKGROUND .......................................................................................... 3

6

7   I.   OAH erred in failing to hold SBSD accountable for unlawful
8        predetermination. .......................................................................................... 7

9        A.   Even focusing on direct evidence about events immediately preceding
              the District's placement offer, predetermination is apparent. ............... 8

10       B.   Judge Lepkowsky ignored indirect but powerful evidence of
11            predetermination. ....................................................................................11

12  II.  OAH erred in completely denying reimbursement for an Independent
13       Educational Evaluation (IEE) performed by Dr. Caroline Bailey in response to
         a District assessment with which the parents disagreed. .................................12

14       A.   SBSD's observations amount to a seriously deficient evaluation........................13

15       B.   An IEE conducted by Dr. Caroline Bailey was as appropriate as the
              District's was flawed, and should be fully, or at least partially,
16            reimbursed. .............................................................................................18

17       C.   The rules suggested by OAH's IEE ruling would create unfortunate
              incentives for families and school districts alike. .................................22

18  III. OAH ordered insufficient remedies for overly restrictive and inappropriate
19       offers. ...........................................................................................................23

20       A.   OAH should have ordered SBSD to continue KA.'s existing support
              unless and until it elected to provide this support internally or with
21            another nonpublic agency. .......................................................................23

22       B.   Plaintiffs were denied reimbursement for educational services provided
              by KA.'s mother, who provided direct instruction services that should
23            have been provided by SBSD. ..................................................................23

24  CONCLUSION.........................................................................................................25

25

26

27

28

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1       KY.D. and B.D. bring this action on behalf of their six-year-old daughter KA.D., who has

2  autism and a vision impairment, both of which have improved dramatically with educational and

3  therapeutic services. They ask that a decision by the Office of Administrative Hearings (OAH)

4  regarding the 2007-08 school year be upheld in its essential aspects and reversed with respect to

5  several relatively minor but significant issues. (The decision is attached hereto as Exh. A.)

6                                  **FACTUAL BACKGROUND**

7       KA. was diagnosed with autism in June 2005, shortly after her second birthday. Her

8  presentation was severe: no functional language, little eye contact, and serious behavior problems

9  including aggression, self-injury and stereotypical movement patterns. Although KA. had received

10 early and perceptive medical referrals starting in April 2005, the San Diego Regional Center

11 (SDRC) took far longer than the law allows to begin Early Start services. In August 2005, Internet

12 research led KY.D., KA.'s mother, to the Brent Woodall Foundation, set up by the widow of a

13 college friend who had been killed on September 11. A few days later, KA. and her mother were in

14 a hotel room in Dallas working with Tracy Woodall, who began using principles from behavioral

15 psychology to reduce KA.'s excess behaviors and build a repertoire of positive "behaviors" such as

16 playing and talking. KA. quickly learned to request items by with pictures and said her first

17 functional word ("Cheetos"), while KY. started learning to provide, and advocate for, the services

18 her daughter needed. Shortly after their return, SDRC finally sent in Coyne & Associates (Coyne),

19 an agency which also contracts with school districts, to provide similar services, called applied

20 behavior analysis (ABA) or behavior intervention, albeit with a small fraction of the intensity that

21 research indicated KA.needed, ensuring that KY.'s role would remain central.

22      By KA.'s third birthday, when educational duties shifted from SDRC to the Solana Beach

23 School District (SBSD), both she and her family had come a long way. KA.'s language had

24 advanced from profoundly to moderately delayed. She had learned games and enjoyed engaging

25 with adults and her sister. KY.D. had become a skillful teacher and "generalizer," and a resource

26 for similarly situated parents. The family had figured out how to access Tri-Care's evolving autism

27 benefits, and after a slow and frustrating start, SDRC was on board for long-term support. Unlike

28 many families, KA.'s did not have to rely entirely on SBSD. But there were services that were

1   squarely within the District's area of responsibility, and outside the realm of any other entity.

2   Though KA. still needed 1:1 instruction and play dates, she was also ready for a preschool where

3   she could spend time regularly with children capable of modeling, and joining in, language and

4   play.

5        Unfortunately, at KA.'s initial Individualized Education Program (IEP) meetings, SBSD

6   refused to educate KA. alongside nondisabled peers and rejected in-home ABA despite KA.'s

7   spectacular response, deeming programs off its own preschool campus "restrictive" even though

8   California's legislature views homes as well as private preschools as suitable educational

9   environments for preschoolers with disabilities. CEC § 56441.4. The District instead proposed its

10  special day class (SDC) designed for severely handicapped three year olds, with some exposure to

11  typical children in the Child Development Center (CDC) (a large fee-for-service preschool/child

12  care program on the same site), and some 1:1 teaching in a special education classroom.

13       KA.'s parents tried to investigate this offer. When KA.'s father returned from Iraq, he was

14  shown an empty classroom with clipboards sitting on a table tallying students' hitting and biting,

15  and denied information about staff training (V. 9, pp. 2012; 2020), while his wife's concerns after

16  seeing students and teachers in action continued to be barely addressed. KA.'s parents filed for

17  hearing, the parties mediated, and ultimately, through a settlement agreement (the terms of which

18  are confidential), KA. spent her year of being three at the Hanna Fenichel Center (HFC), a

19  neighborhood preschool with small class sizes and a low student teacher ratio, which has secured

20  staff training and hired teachers with relevant experience in support of its commitment to offering

21  positive environments for its small minority of students with disabilities. KA. received ABA

22  services at home and school, and came to SBSD for speech and language therapy twice a week.

23       By all accounts, KA. made excellent progress, and in preparing for her first annual IEP

24  review, her parents hoped SBSD would cooperate in letting KA. move up to the four year old

25  classroom (which met for 17 rather than 6 hours per week). KY.D. tried to get KA.'s IEP

26  completed by her annual IEP due date, March 31, so that her husband could participate in

27  observations before returning to Iraq and so that, if worse came to worst, legal follow up could

28  occur before the previous year's settlement agreement expired in August. Due to District delays,

2

1  the IEP process finally wrapped up on June 13, 2007, with the District again offering its usual

2  venues: two hours in the SDC for four-year-olds; two hours being supported by adults and one or

3  more "peer buddies" at CDC; and two hours of "extended day" (mainly 1:1 ABA in a small

4  enclosed space, though staff might bring in peers, who might or might not have disabilities).

5      Though upsetting, by that point the offer was no surprise, since before KA.'s IEP team even

6  met to discuss placement, SBSD's special education director, Mary Ellen Nest, had already told

7  KA.'s mother on the phone, in person and in the presence of witnesses that the District would be

8  seeking the kind of "structure" that could be offered by their SDC. Ms. Nest called KY.D. to

9  request that the family "agree to disagree" at the IEP level, refrain from upsetting staff, and proceed

10 thereafter to "informal mediation" (V. 4, pp. 1006-07).[1] During the two IEP meetings that

11 followed, staff scrambled to put together "pieces" available on their site into a plausible program,

12 but without ever considering how it would all fit together, and to justify the stance which Ms. Nest

13 had laid out.  When the family responded to the District's final offer by filing for due process,

14 SBSD counsel secured the family's agreement to forego an early resolution session which had been

15 scheduled (V. 12, at 3035) and which is mandatory unless both sides waive it, by proposing to go

16 straight to mediation, and then cancelled mediation a few days before it was to occur, asking that

17 the case go straight to hearing  (V. 12, at 3016), which it did in Oct. and Nov. 2007.

18                              **LEGAL BACKGROUND**

19     OAH correctly decided the two fundamental issues: 1) that the plan of the Solana Beach

20 School District (SBSD) to shift KA. from HFC, even though as the ALJ noted, "[a]ll parties,

21 including the District's expert consultant, gave glowing reviews of its staff and program as well as

22 of the excellent progress Student has made while attending that school (Exh. A, at 32 ¶ 100)," to a

23 rigidly "structured" SDC in which a majority of students had disabilities, in most cases autism,

24 violated her right to be educated to the maximum extent appropriate alongside nondisabled peers

25 _____

26 [1] Though she did not tell the family then what she had in mind, it appears her intention was to
continue what she said she thought had been the previous year's settlement terms, which she claimed

27 to have thought was what the family was hoping for.  It was not, because with the near-tripling of
school hours, keeping SBSD's contribution at the same level would have drastically increased the

28 family's financial burdens.

1   (often shortened to the "least restrictive environment" or "LRE"); and 2) that the proposed

2   mainstreaming "piece" at the CDC located on the same site, and the transitions surrounding that

3   program, were inappropriate, contradicting the recommendations even of Dr. Laura Schreibman of

4   UCSD, the District's sole outside expert witness. Just one-third of the District's proposed

5   schedule—its plan to do 1:1 ABA at school rather than at home—was approved.

6          As for KA.'s right to be educated without unnecessary removal into special classes, there was

7   virtually uncontradicted evidence. Though everyone agreed she was doing well, Dr. Schreibman

8   and some staff thought she might do even better with SBSD's concentration of supports on one site

9   (e.g. V. 1,  pp. 164-66; V. 8, pp. 1804-06), and the school psychologist thought that while what she

10  wanted for KA. could happen at HFC, the District had an "obligation" to provide a "public

11  education program" (V. 9, pp. 2113; 2118; 2121-22; 2136-37). Witnesses for the District could

12  point to no research suggest that Dr. Schreibman's notion of taking a step back to go forward was

13  necessary or would benefit KA., and almost none to counter reasonable concerns that she was likely

14  to lose ground socially, behaviorally and linguistically. Though staff lined up behind their

15  supervisor's refusal to continue KA.'s existing program, their rationales, plans, and criteria for

16  letting KA. return to inclusion were contradictory. There was no effort to figure out how the

17  ostensible concerns could be addressed without removal from general education. Judge

18  Lepkowsky's holding was not just correct but inevitable under *Sacramento City Unif. Sch. Dist. v.*

19  *Rachel Holland.*, 14 F.3d 1398, 1404 (9th Cir.), *cert. denied*, 512 U.S. 1207 (1994) and *Florence*

20  *County School District Four v. Carter*, 510 U.S. 7 (1993): a child making progress in general

21  education which fully satisfied the "appropriateness" requirements of IDEA could not be relegated

22  to a more restrictive setting in hopes she might do even better, and thus KA.'s parents were owed

23  tuition reimbursement for, and she had a right to continued support in, her general education

24  preschool.

25         Though a bit mixed, the evidence also overwhelmingly supported OAH's second main

26  holding—that the District's mainstreaming offer, and thus, its overall Monday-Thursday[2] plan for

27  _____

28  [2] Children with IEPs do not come to the CDC or their SDCs on Fridays, though aides are
    available for "extended day" services.  (V. 3, p. 557 l. 1 – p. 558 l. 13.)

1   KA., were inappropriate in the sense of not even being calculated to yield meaningful educational

2   benefit.[3]  OAH found for the family on narrow but compelling grounds—that KA. would have been

3   exposed to too many children and transitions—barely or not addressing other parts of the family's

4   critique of SBSD's plan which provided powerful alternative grounds for the same outcome.  For a

5   decisive rejection of the District's proposal to block KA. from advancing at Hanna Fenichel from a

6   class of up to ten three-year-olds to a class of fourteen four-year-olds, and send her instead to cope

7   with approximately 42 "classmates" per day (and even more children daily and weekly, given

8   varying child care schedules and playground assignments and the likelihood that other children

9   would be incorporated during some of her ABA time), OAH did not have to look beyond Dr.

10  Schreibman, who unequivocally testified that CDC's class sizes made it inappropropriate for KA.[4]

11  Though she declined to "speculate" about whether KA., like many children with autism, would

12  have trouble with transitions, virtually everyone that knew her gave detailed reasons to believe that

13  that she does, and though SBSD staff discounted concerns, they did so with no real basis.

14       OAH conducted an eleven day hearing and admitted educational records, program plans,

15  meeting audiotapes and transcripts, and some research.  An ALJ with specialized training had

16  ample opportunity to observe witness demeanor and analyze SBSD's offering—no easy task given

17

---

18  [3] The ALJ did not venture to predict whether the proposed program was inappropriate in the
    sense of being likely to produce insufficient gains, stagnation or outright regression.  There was
19  virtually no upside in the District's gamble, and much risk.   Though staff had no problem with
    replacing KA.'s successful program with one that would apparently require her to transition more
20  than anyone else her age (V. 3, p. 553, l.16 – p. 555, l. 20). and which would expose her to over 42
    children per day and even more per week, this plan risked disaster, including tantrums in full view of
21  children with whom she would soon be starting "real school."  Charts describing the placement
22  proposed by her family and that offered by SBSD are attached as Exh. B.; the District's plan would
    be challenging for a neurotypical adult. Trying to impose it on a four year old with autism risked
23  turning SBSD's insistence that KA. needed to enter its SDC track into a self-fulfilling prophecy.  At
24  the very least, yanking KA. away from actual friends and a setting conducive to making more in
    favor of an environment in which she was reasonably expected to need assigned "peer buddies"
25  would undo social progress and connectedness, inhibit future growth and create stigma.
26  [4] Perhaps for this reason, she gave almost no attention to testimony from the family's
    numerous, well-qualified witnesses, including Len Levin, PhD. (Coyne's clinical director); Jessica
27  Korneder, BCBA (Coyne regional director); Joseph Morrow, PhD., BCBA; Sarah Hillier (HFC
    director); Caroline Bailey, PhD.; Jane Whitney (SDRC educational consultant); Jennifer Bartoloni
28  (HFC teacher).

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1  discrepancies between what was written and what was said and among different witnesses'

2  accounts. Though the paper record cannot capture everything that properly informed OAH's

3  decision, it strongly supports the central holdings on inclusion and appropriateness. Petitioners

4  contend that OAH erred factually on a few less critical points, where the evidence was not as strong

5  or as obvious in the absence of a transcript, and as to several matters where the law is less settled.

6  Since each side will begin by challenging the portions of the decision which it disagrees, the

7  arguments presented initially on student's behalf will relate to the relatively minor issues on which

8  the family did not prevail. First, OAH erred in denying any reimbursement for the Independent

9  Educational Evaluation (IEE) secured by KA.'s parents from Dr. Caroline Bailey.[5] Second, OAH

10  should have held that KA.'s placement was improperly "predetermined" in that important options

11  were ruled out before, and outside, the spring 2007 IEP process.[6] Third, OAH's financial orders

12  erred; though the amount in controversy may seem modest, it would not be for all families and was

13  not for this one at the time, and the principles are important.[7]

14  KA.'s family requests that the pleadings below be considered in addition to the necessarily

15  compressed presentation at this level. The student's arguments, which appear at V. 18, Exhs. 23 &

16  24, present the statutory framework, factual background, and educational concepts and programs in

17  controversy.[8]  The family requests that this Court consider how the District presented evidence and

18
19  [5] OAH artificially distinguished between "observations" and "assessments," and failed adequately to compare the District's and family's evaluations. This thorough, careful IEE was needed to safeguard KA's inclusive placement and would have been even more critical had Dr. Schreibman not repudiated SBSD's offer.
20
21  [6] OAH subtly mishandled testimony even for the few interactions considered, which were a small subset of those that should have been. While predetermination formed an alternative, procedural basis for a decision on which the family largely prevailed substantively, it matters because a) KA.'s family should be compensated for procedural violations even if this Court agrees with OAH's substantive acceptance of replacing home with school ABA; b) attorneys' fees should be awarded for litigating an issue too big and serious to ignore; and c) it is important for KA. and other students that SBSD and other districts desist from this conduct.
22
23
24
25  [7] KA.'s mother's personal efforts were not reimbursed, because of errors both as to KA.'s right to receive services and her mother's right to compensation for providing them directly. Even more concerning, OAH's order created out-of-pocket costs: although the ALJ ordered SBSD to support KA. at preschool, she gave the District 30 days to comply, which it took.
26
27
28  [8] They explain how interventions derived from the experimental analysis of "behaviors"—all observable, voluntary actions—are used to teach language, social, play, self-help and other skills to

1   framed legal arguments below.  In closing arguments, *id.* at Exhs. 22 & 25, SBSD's counsel

2   overreached both as to facts[9] and law.[10]  The District put on weak evidence, and it can be inferred

3   that what it chose to omit would have been even more damaging.[11]  Staff testified exceptionally

4   vaguely, evincing no effort to look up or recall relevant information.  Now SBSD seeks to set aside

5   OAH's main findings, presumably to avoid the attorneys' fees and embarrassment which are the

6   natural consequences of making untenable offers, rejecting the ADR  proceedings that nearly

7   always precede due process, and taking a very weak case to hearing.

8   **I.      OAH erred in failing to hold SBSD accountable for unlawful predetermination.**

9          Judge Lepkowsky ignored powerful direct and indirect evidence of predetermination, going

10  so far as to find "no tangible evidence" of predetermination other than the fact that the parents'

11  children with autism, and to reduce undesired behaviors.  They set forth not just the strong legal right
12  to be educated to the maximum extent appropriate alongside nondisabled peers—a right which
    trumps even claims that a specialized placement is "superior" to general education that are far more
13  plausible than those advanced here—but the vital practical significance of inclusion for KA.'s ability
    to continue her dramatically positive trajectory.  They set forth in more detail than can be done here
14  the downhill process which began in early 2007 and hopefully will end here and soon.

15         [9] For instance, SBSD claimed its offer contained no additional transitions by looking at
    activity shifts without regard for whether peers, adults and locations were changing.  (V. 18, p.
16  5831.)

17         [10] It proposed an extreme overreading of *Schaffer v. Weast*, in which parents would nearly
    always lose because rather than the burden of proof functioning as a tie-breaker, programs would be
18  "presumed" appropriate and district witnesses accorded special deference (*id.* at 5819.)

19         [11] SBSD had ample opportunity and abundant resources to put on its case, yet relied on one
    outside expert, who rejected the District's plan when it was presented in hypothetical form at
20  hearing.  She had previously been falsely reassured that the normal class size was 12 (V. 9, p. 2195
    l.15- p. 2196, l. 2; p. 2240 l. 22 – p. 2242 l. 5).  This was an even more audacious twist on the claim
21  made to the hearing officer by special education staff to the effect that the class would include 12
    students during KA.'s time there (V. 2, p. 338), a claim that was punctured by CDC staff (V. 4, 898;
22  904-07).  The District opted not to call Dr. Erin Ring, a key witness initially listed on its disclosure
    of potential experts (V. 18, p. 5965); her CV was supplied.  (V.17, pp. 5655-62.)  It is reasonable to
23  infer that her input would not have been helpful.  Erin Ring had designed the very problematic
    program that the District was offering (its description is at V. 17, pp. 5595-5603).  She was a Board
24  Certified Behavior Analyst who would have been able to answer questions regarding District ABA
    practices and was presented as a consultant and as a back up supervisor if Jodie Reise was stretched
25  too thin.  Ms. Nest referred to her as the person who would know the research basis for SBSD's
    approach.  (V. 2, pp. 320-21.)  She had also seen KA. in her capacity as an SDRC consultant at a
26  little over two years of age and set her initial Early Start services at a grossly inadequate level (V. 8,
27  1917-18), acting as though she did not recognize the seminal research to which KA.'s mother
    alluded and warning her not to believe everything she read on the Internet.

1  preferred placement was not offered. (Exh. A, at 17 ¶ 33.) In fact, though it is notoriously difficult

2  for families to prove administrators' intent, Ms. Nest removed this difficulty by telling multiple,

3  credible witnesses that there would be no agreement at the IEP level, and that she hoped the family

4  would "agree to disagree," not upset staff, and follow up with "informal mediation." It is hard to

5  imagine a more blatant or complete marginalization of the sometimes painful dialogue at the heart

6  of IDEA, in which parents and professionals are supposed to work together to determine "the

7  educational method most suitable to the child's needs," *Hendrick Hudson Central Sch. Dist. v.*

8  *Rowley*, 458 U.S. 176, 207 (1982). Procedural violations that "interfere with parental participation

9  in the IEP formulation process undermine the very essence of the IDEA," and warrant relief even in

10 the absence of substantive errors. *Amanda J. v. Clark Co. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir.

11 2001). A district must "conduct a meaningful meeting with the appropriate parties" and "develop a

12 complete and sufficiently individualized educational program." *W.G. v. Target Range Sch. Dist.*,

13 960 F.2d 1479, 1484-85 (9th Cir. 1992). As in most predetermination claims, *e.g. Deal v. Hamilton*

14 *Co. Bd. of Educ.*, 392 F.3d 840, 855-59 (6th Cir. 2005), *cert. denied*, 546 U.S. 936 (2005), the

15 problem is not that every detail was predetermined, but that key options were excluded.[12] Letting

16 parents and those accompanying them speak freely at IEP meetings means nothing if their

17 arguments are brushed off and the family has already been told any movement in their direction

18 will need to come outside of the IEP process.[13]

19   A.   **Even focusing on direct evidence about events immediately preceding the
20        District's placement offer, predetermination is apparent.**

21     It appears fairly clear that Ms. Nest approached the spring 2007 IEP process planning to deny

22 what she expected KA.'s parents to request: continuing the inclusive, research-based program

---

24 [12] Though Ms. Nest had decided not to continue existing services through an IEP before
   assessments even started, coming up with a concrete offer was tricky, since Dr. Schreibman had
25 firmly opposed the District's sole mainstreaming option, yet shifting to an SDC until autistic
   behaviors were extinguished, with inclusion to follow, was legally indefensible, and incorporating
26 HFC, as Dr. Schreibman preferred, was unpalatable.
27 [13] *Parents v. Modesto City Schools,* OAH Case Nos. 20090300737 & 2008040702 (2008)
   (9/12/08), at 9-10 (improper for staff to keep changing the subject back to their own program and
28 refuse to consider parents' request except as part of extra-IEP process involving regional center).

1   which had brought KA. from severe disability to a far milder level of impairment.  Around

2   February, though SBSD staff had only seen KA. in speech and language therapy, where as her

3   therapist eventually conceded, she had made "fantastic progress" (V. 8, pp. 1761-72), Ms. Nest

4   brought in Dr. Schreibman, who had observed KA. as a potential expert while the previous

5   summer's due process case was pending, asking her to take another look at KA. and make

6   recommendations.  Dr. Schreibman, a firm, consistent witness, credibly testified that Ms. Nest told

7   her at the outset that there was a "disagreement."  (V. 9, p. 2175 l. 15 – p. 2176, l. 9.)  Though Ms.

8   Nest called it a "consult," her testimony was full of vague statements, memory lapses and self-

9   corrections.  Dr. Schreibman observed KA. at HFC, though she did not look at the next class up,

10   and visited the District's options for the next year—CDC and the SDC for four-year-olds.  She was

11   not asked to and did not see KA. at home.  Given how very well KA. was doing, Dr. Schreibman's

12   goal was to eliminate autistic behaviors that might someday become stigmatizing, which she tought

13   it was most realistic to attempt in an SDC.  Once this was achieved, she believed, KA. would be

14   ready for inclusion in a small preschool program, albeit she was "nowhere near" ready for what she

15   correctly understood CDC to feature: classes of 24 students.  (V. 9, pp. 2303-04; V. 12, pp. 3247-

16   48.)

17        What followed is barely and immaterially disputed.[14]   After getting Dr. Schreibman's letter,

18   but before the IEP team gathered to discuss assessment findings and placement, Ms. Nest told

19   KY.D. that SBSD's "team" would propose more "structure."[15]  It is unlikely that Ms. Nest was

20   merely "channeling" suggestions by others that KA. might do even better outside of general

21

---

22        [14] This information was set out at greater length in prehearing pleadings after the District
23   tried to put to rest predetermination claims in the student's July 10, 2007 due process filing by
     asserting they involved privileged settlement discussions in April, May and June to which student's
24   counsel was improperly referring.  (V. 18, pp. 5919-5939; 5950; 5959.)  Superintendent Leslie
     Fausset did not respond to Ms. Doyle's contemporaneous protest detailing Ms. Nest's
25   communications with her (AR, V. 12, at 3179-81), nor did staff contradict it in any essential respects
     at hearing.
26        [15] Though at the time Ms. Nest told KY.D. that she had not yet talked to staff, and at hearing
27   she said she was not sure whether she had done so (V. 1, p. 216) she did not present this merely as
     her personal opinion—as was Judge Lepkowsky's interpretation—but as what would be happening
28   at KA.'s IEP meeting (V. 1, p. 211).

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   education, and in any case this would be no excuse.[16]  Ms. Nest did allude to an extra-IEP route for

2   keeping KA. at HFC, but its first step—curtailing family input during the IEP process—would have

3   been highly prejudicial if "informal mediation" did not suffice.  Ms. Nest's comments troubled not

4   only KA.'s mother but seasoned special education professionals; when they gave Ms. Nest a chance

5   to back off,[17] she reiterated her position, this time in front of two staffers who commiserated

6   privately with KA.'s mother but did nothing to alter the course of events.[18]

7          Two IEP meetings followed, but at neither was there meaningful discussion of keeping KA.

8   at HFC or continuing in-home services.  On May 11, after KY.D. gave a detailed account of

9   observations at SBSD and her concerns, Ms. Nest instructed the "team" to "move on."  (V.14, pp.

10  4332-36.)  She prematurely declared impasse.  (*Id.*, pp. 4331, 4358.)  Though SBSD's counsel

11  dissuaded Ms. Nest from her ill-advised plan to finish the "FAPE [free appropriate public

12  education] offer" internally and send it to the parents (*id*, p. 4358), Dr. Schreibman was not invited

13  back to discuss actual program details.  At the June 13 meeting, staff moved straight to their

14  standard options, making what turned out to be an unrealistic commitment to ameliorate the class

15  size concern[19] but failed to consider what it would take for KA. to stay in her research-based,

16  ────────────────────

17  [16] Not only would this still constitute predetermination, as the IEP team had yet to meet, but on its face, Dr. Schreibman's hope to move a student doing very well in inclusion to an SDC in
18  hopes of extinguishing autistic behaviors denied LRE rights, and Ms. Nest was not entitled to assume that her "team" would endorse such an unlawful plan. To the extent that staff too had a
19  tendency to put "team pride" or logistical convenience above LRE requirements, it was up to Ms. Nest as the responsible administrator to counter that tendency, not pass along notions that had never
20  been scrutinized in terms of the *Holland* factors to the parent as a "heads up" on what the IEP team
21  would be doing.
       [17] School psychologist Sharon Loveman arranged a meeting involving Ms. Nest, KY.D.,
22  herself, speech and language pathologist Lisa Ryder and  Jane Whitney, the SDRC educational consultant who had worked with the family over a long period, and had called Ms. Nest to try to
23  facilitate, not circumvent, the IEP process. (V. 4, pp. 794-98; 802-03.)  The purpose was to "clear the air" of predetermination concerns. (V. 4, pp. 798-01.) Ms. Nest's claim that Ms. Whitney started
24  the notion of simply continuing the settlement agreement (V. 1, p. 211) is inaccurate, and like other
25  excuses for the District's evasion of the IEP process, irrelevant.
       [18] V. 4, pp. 1011-14, 1019-21; V. 5, p. 1044.
26     [19] Though KA.'s IEP commits to a class size of 12, presumably meaning during the two
27  hours she was originally slated to be there (V. 12, p. 3111), it emerged that the class size was still 24, and that half-class rotations would comprise just 1/3 of KA.'s CDC time, that students would
28  fluctuate because of varying child care schedules, and that since recess and snack time combine CDC

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1    inclusive and highly effective program, with either District or Coyne ABA support.  SBSD's

2    attorney asked for an "agreement to disagree" before most team members had expressed their

3    views.  (*Id.*, p. 4401.)  Discussion was curtailed, with the IEP asserting that "it appears that the

4    parties are agreeing to disagree on placement."  During the controlled discussions at IEP meetings,

5    though staff scrambled in mutually inconsistent ways to justify their "FAPE offer," at no point did

6    they veer from the course announced by Ms. Nest before IEP deliberations started.

7           **B.       Judge Lepkowsky ignored indirect but powerful evidence of predetermination.**

8           Staff who claimed that family requests were "considered' did so in conclusory ways that were

9    implausible (V. 1, p. 193) or dissociated from the IEP process (V. 9, pp. 2136-37).  Dr.

10   Schreibman, who wanted a continuing role for HFC and thought CDC clearly unsuitable, was not

11   invited back to design or understand the final offer.  Despite their supposed concerns about moving

12   from HFC to kindergarten, Dr. Schreibman and staff failed to observe the class to which KA. could

13   advance at HFC,[20] or to look into whether Coyne and HFC staff could use, or were using, the very

14   strategies they proposed to use.  (E.g. V. 8, p. 1825 l. 6 – p. 1826 l. 73.)

15          That KA.'s family was reacting to a real problem is confirmed by their brief but intense

16   history.  In July 2005, nearly a year before KA. turned three, Erin Ring, who has consulted for

17   SBSD and SDRC, told KY.D. that the low number of hours she was authorizing through SDRC

18   would drop at age three.  At a February 2006 transition meeting, SBSD teacher Janet Dusch

19   explained her class, the District's only one, and that ABA would occur in her room.  (V. 4, pp.

20   971.)  Though Judge Lepkowsky stressed differences between the District's posture in spring 2006

21   and 2007, the similarities are more striking.  Despite KA.'s dramatic progress, SBSD reshuffled the

22   same elements with even the relative mix changing less than met the eye.[21]  Indeed, staff take

23   and SDC students, designating them as "CDC time" was arbitrary and, given the paucity of social

24   facilitation and limited CDC teacher involvement with students who are supported by aides,
     misleading.

25          [20] This was not, as the hearing officer charitably concluded, because they had not been "able"

26   to do so (Exh. A, at 5709 ¶ 33), but because staff did not ask to see it late in the process, at a difficult
     time for HFC (V. 12, at 3196), and did not take any steps to make it happen during the long gap

27   between IEP meetings.

           [21] Through a series of meetings and letters in spring 2006, Ms. Nest made clear that KA.

28   would need to go into the single SDC for three-year-olds, and that mainstreaming could consist of

                                              11                        08-cv-00622-W (POR)
           PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1    considerable pride in physically concentrating preschoolers with disabilities on a site where

2    "collaboration" is so easy.  None of the three key features of KA.'s program—ongoing in-home

3    services, full-time general education preschool, and individualized ABA with knowledgeable

4    experts on early intervention in autism—is consistent with SBSD's model, and at no point did the

5    District consider departing from that model through an IEP process.  It does not appear to have

6    done so for other children, though staff were particularly vague in responding to questions on that

7    score.  They did not discuss doing so for KA. with her family or, apparently, internally.

8    **II.    OAH erred in completely denying reimbursement for an Independent Educational**

9    **Evaluation (IEE) performed by Dr. Caroline Bailey in response to a District evaluation**
     **with which the parents disagreed.**

10         IDEA regulations give parents who disagree with district evaluations the right to an IEE at

11   public expense unless the district proves its evaluation was appropriate or that the parental

12   assessment failed to meet reasonable criteria set by it.  34 C.F.R. § 300.502.  SBSD did not meet

13   either burden, or try to. Instead, after three staffers and a world-renowned autism expert observed

14   KA. in three settings, reviewed public and private records, and called for radical program changes

15   based on their findings, SBSD claimed they had done mere "observations" which triggered no IEE

16   right (V. 18, p. 5838), and put on no evidence about any local IEE criteria. Yet they won, after

17   OAH adopted their distinction between "observations" and assessments," faulted the family for

18   having failed to obtain a "real" IEE (in her view, one with standardized testing), and found the

19   family had failed to meet a newly defined burden—proving the superiority of observations—which

20   given the ALJ's theory that no criteria[22] even apply appears insurmountable.

21

22   her spending some time, eventually pinned down to about an hour a day, in CDC, and that 1:1

23   teaching would occur at school, not home.  (V.4, p. 972; V. 17, pp. 5529-30.)  In June 2006 Ms.
     Nest asked KY.D. what she thought about creating one or more small classes more suitable for

24   inclusion at CDC, and though she responded positively, nothing came of this.  Instead, in spring
     2007, despite KA.'s success in inclusion and despite the District's expert's admiration of HFC and

25   view that CDC was not appropriate and would not be any time soon, what was on the table for the
     next IEP was the same three-part program—and even changes in the mix were more apparent than

26   real since CDC and SDC students were in the same common areas for part of the day anyway.

27       [22] By barring recovery for expert fees for hearing preparation and testimony, *Arlington* made
     the right to an adequate IEE in which necessary information could at least be gathered at public

28   expense an even more critical protection for access to due process.

                                                   12                    08-cv-00622-W (POR)

The right to an IEE is at the top of Congress's list of procedural safeguards of which parents must be periodically informed. 20 U.S.C. §§ 1415(b)(1) & 1415(d)(2) (A). IEEs were recognized as a key safeguard in *Schaffer v. Weast* 546 U.S. 49 (2005),[23] made even more vital by *Arlington v. Murphy*, 548 U.S. 291 (2006). It would have been risky to approach school age, and foolhardy to enter due process, without an IEE that put into perspective and defined research-based responses to the concerns over "autistic behaviors," dependency and generalization that SBSD took as precluding full inclusion and rendering in-home ABA unnecessary or detrimental. Facing a district intent on going straight to hearing, with Laura Schreibman's recommendations at the center of its case, KA.'s parents needed, and got, an IEE.

### A. SBSD's observations amount to a seriously deficient evaluation.

OAH erroneously accepted the District's characterization of its review of KA.'s performance as a set of "observations" rather than an "assessment." However, treating the spring 2007 process as anything other than a formal assessment is at odds with how it originated,[24] was carried out,[25]

---

[23] The Supreme Court declined to override the rule that the party initiating a case bears the burden of proof largely because it did not perceive a serious imbalance in access to information:

> The regulations clarify this entitlement by providing that a 'parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency.' (citation omitted) IDEA thus ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.

*Id.* at 60-61.

[24] Observations of KA. began in response to her mother's signature on an assessment plan which was developed at an IEP meeting convened to "discuss need for reevaluations." (V. 12, p. 3319.) The plan itself explained that there would be an "outside evaluation" in order to "update present levels for purpose (sic) educational planning," the category for which was "other needed evaluation for identified student." (*Id.*, p. 3263.) The meeting notes noted KY.D.'s request for a "written description in advance of the consultation/assessment that will be conducted by a private Autism consultant to be contracted by the District," as well as the "team's" plan to make "every effort" to provide "evaluation reports" prior to the IEP (*Id .*, p. 3107.) KA.'s parents have received procedural safeguards presumably containing, as required, IEE rights.

[25] The District conducted an assessment involving over ten hours of observation by four individuals in three settings, as well as standardized language testing. Scores were combined with observations in an "Individual Summary of Assessment / Speech and Language." (*id.*, pp. 3154-60.)

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   and ended.[26]  Moreover, California defines "assessment" as having the same meaning as

2   "evaluation" in federal law.  CEC § 56302.5.  IEE rights under federal law do not depend on

3   standardized testing having formed part of the challenged evaluation.  An evaluation takes place

4   when information is gathered to assist in the determination of "the content of the child's [IEP]." 20

5   U.S.C. § 1415(b)(2).  An observation is part of an evaluation when it is used as "the basis for

6   making the determination" of a pupil's need for special education and related services.  CEC §

7   56327.  While an assessment report must include information gathered through observation, CEC §

8   56327(c)-(d), there is no similar requirement that it include the results of standardized testing.  That

9   Dr. Schreibman gathered information for the purpose of determining KA.'s needs and the content

10  of her program—i.e., that she performed an evaluation—is clear.   Questions of the appropriateness

11  of the evaluation, most fundamentally, whether the strategies used provided "relevant information

12  that directly assist[ed] persons in determining the educational needs of the child," do not depend for

13  their answers on the use of standardized testing. 20 U.S.C. § 1415(b)(2). There are statutory,

14  regulatory and common sense standards, and the District's assessment falls short of them.  While

15  some specific requirements for standardized testing have no application to observations, other

16  requirements apply regardless of the nature of the evaluation procedure, and similar concerns exist

17  with respect to all forms of evaluation.  Tests must be chosen not to be racially or culturally

18  discriminatory, and observers should obviously strive for the same qualities.  Though assessments

19  must take into account all areas of suspected disability, KA.'s longstanding vision problem was

20  completely ignored, contributing to flawed recommendations.[27]  The fact that though she received

21  
    [26] The agenda for the May 11 IEP refers to reviewing "assessments." (*Id.*, p. 3149.) This
22  formal, consented to, multidisciplinary assessment, capped with recommendations by a famous
    autism expert, formed the rationale (and conceivably the basis), for SBSD's push to remove KA.
23  from her inclusive preschool as well as to terminate her in-home program.  IEPs are to reflect
24  assessment data, and this assessment was the sole source of information supporting the spring 2007
    proposed IEP (which sharply contradicted the family's requests and recommendations from HFC,
25  Coyne and Ms. Whitney).  Finally, it is hard to imagine a purer "litigation afterthought:" SBSD filed
26  for hearing to demonstrate the appropriateness, not nonexistence, of its assessment.  (V. 18, pp.
    6011-15.)
27      [27] Though the District's itinerant visual specialist has warned of visual fatigue (V.12, p.
    3129) and her IEP calls for "visual breaks," (*id.*, p. 3081), Dr. Schreibman had not noticed frequent
28  references in records to vision problems, and though she wondered about vision when she saw KA.,

1   records, Dr. Schreibman failed to notice references to atrophy of one eye suggests that she relied

2   very heavily on observation, violating the prohibition on basing decisions on a single procedure.

3   CEC § 56320(e). Dr. Schreibman's focus on the negative, other than a brief acknowledgement that

4   she had made "substantial and impressive progress" during the past year, was also problematic as

5   the purpose of the assessment is to inform an IEP, and IEPs must take into account student

6   strengths.[28] The "theoretical" underpinning of her recommendation was not the peer-reviewed

7   research that is supposed to be incorporated into IEPs.[29] Her cursory, result-oriented document did

8   not even sufficiently convey her own views; an evaluation which has to be supplemented by cross-

9   examination does not provide adequate guidance for IEP teams, which meet before hearings.[30]

10

11   she treated very occasional looking at walls not only as a behavior but, in a more remarkable leap, as a basis for removing KA. from general education. As in *Val Verde,* at 29, this gap affected the overall validity of the District's conclusions.

12   [28] 20 U.S. § 1414(d)(3)(A)(i). For KA., a key strength was her extremely rapid rate and high

13   quality of progress with just the kind of traditional ABA program combining 1:1 home-based

14   instruction with inclusive preschool and playdates which Dr. Schreibman was proposing to replace by an SDC model that has fared much more poorly in research. It should not have taken a hearing to

15   learn that the negative behaviors described by Dr. Schreibman were low in frequency, duration and intensity, and that much of the time KA. demonstrated positive behaviors: that should have been

16   apparent from her assessment report, and was not.

17   [29] At the IEP meeting to discuss her assessment, Ms. Nest cut off questioning of Dr. Schreibman about reasons for her views. (V. 14, pp. 4325-29.) At hearing, she was not aware of any

18   research supporting SDC placements over inclusion for reducing perseverative play (V. 9, p. 2254 l. 23 – P. 2255 l. 8), and identified no empirical support for her view that it was so high a priority for

19   KA. to eliminate "distinguishing" autistic behaviors that it made sense to scrap inclusion and existing peer friendships in hopes of doing so. Rather, she referred to the "effect on her" of seeing

20   high-functioning people with autism who wish they had not been treated as different and teased. (V. 9, p. 2186 ll. 2-25). This led to a proposal sharply at odds with IDEA's LRE mandates and

21   requirement that IEPs incorporate peer-reviewed research to the extent practicable. 20 U.S.C. §

22   1414(d)(1)(A)(i)(IV). It ignored Congress's and the Supreme Court's view beginning in race cases and continuing in the disability arena that forced segregation, not difference per se, generates stigma.

23   Finally, it is unlikely that people who decry teasing would look back more fondly on decisions by

24   adults in power to segregate them and work on "extinguishing" neurologically rooted "behaviors."

25   [30] At hearing, she conceded critical points that needed to be taken into account by anyone purporting to follow her recommendations (which had gone unnoticed in the IEP process for which

26   she had dropped in), or seeking to evaluate the correspondence between her recommendations and peer-reviewed research or legal rules: (1) If KA. were to be removed from her community preschool

27   to participate in a special day class, the IEP team would need to develop and monitor empirical "exit criteria," and it would be far more promising to try to reintegrate her into a small class such as her

28   current one than CDC. (2) Though Dr. Schreibman had acknowledged in passing in her letter that

15                                                   08-cv-00622-W (POR)

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1    OAH's concern that observation guidelines are not spelled out is just partially true and irrelevant.[31]

2       Moreover, OAH lost sight of the crucial function of IEEs under IDEA. An assessment does

3 not become "appropriate" merely by steering clear of the specific statutory prohibitions in

4 Education Code 56320, such as those on violating test protocols and using biased instruments; the

5 more fundamental question is whether an assessment being defended against an IEE or IEE request

6 provides "a clear understanding of [a student's] relative strengths and weaknesses and offer[s]

7 services that meet his unique individual needs."[32] This case closely resembles *A.S. v. Norwalk*

8 *Board of Educ.*, 183 F.Supp.2d 534 (D. Ct. 2002).[33] SBSD cannot claim the mantle of objectivity

9

10    KA's "noncontextual language" and forceful dinosaur preference were to some extent not surprising given her age, the implication was that the goal should not really be "extinguishing" them. To

11 operationalize these concerns it would be necessary to set reduction targets that took into account typical peers' "rates" of these behaviors, which she had made no effort to do. What Dr. Schreibman

12 proposed to do with this information was to establish reaching typical rates of these behaviors as a necessary, though not necessarily sufficient, condition for returning to general education. (3) She did

13 not think KA. needed or would benefit from the "visuals" that are an essential strategy of the SBSD preschool special education classes, and had in mind more verbal prompting, a recommendation

14 sharply at odds with the plans of Jodie Reise, who would actually control KA.'s program and who

15 was heavily influenced by TEACCH, a non-ABA model that views lifelong support as generally inevitable and tends to accommodate autistic behaviors rather than focusing on their fundamental

16 alteration (V. 16, at 4996-5006). (4) Her preference for an SDC as a more "realistic" setting for getting needed supports was based on the incorrect assumption that redirections at HFC would have

17 to come from the "behavior lady" rather than classroom teachers, who are committed to promoting

18 varied and skill-building play for all their students and do so.

   [31] The fact that statutes and regulations are not exhaustive is one of the reasons judging is

19 necessary, not a problem making it impossible. Given the multiplicity of professions and settings that may be involved, it is hard to imagine how observation "criteria" could be put in a statute. Even

20 for formal tests, statutes do not provide or reference all relevant considerations. Rather than laying

21 out specifics, they require following producers' instructions, but even if a testing manual did not say that the student must not have a fever or should not be given the exam in question at the end of eight

22 hours of consecutive testing, judges would need to take into account factors casting doubt on results.

   [32] S *an Luis Coastal Unif. Sch. Dist. v. Benjamin L.*, OAH No. N2005080655, at 15-16

23 (2005), *partially reversed on other grounds sub nom. B.L. v. San Luis Coastal Sch. Dist.*, CV 06-

24 1747 (2007). *Modesto City Schools, id.,* at 13, 16 (evaluation lacking necessary data does not "sufficiently fulfill the requirement of providing relevant information to assist the IEP team in

25 determining Student's educational needs related to decreasing his problem behaviors," and an IEE

26 that fills gaps is reimburseable).

   [33] In that case, though the District complained about the independent assessor's methodology

27 and claimed the assessment was litigation-, not IEP-driven, an IEE which helped parents present the student's needs accurately in due process, as part of the parents' resistance to a more restrictive than

28 necessary placement, warranted reimbursement.

1     that comes from relying on, and adhering to administration requirements for, standardized

2     instruments: the only instruments it used, in the speech and language area, suggested that KA.'s

3     existing program was working extremely well, as did other measures of language and cognition.

4     SBSD's multi-faceted assessment pointed KA.'s IEP team, and threatened to point OAH, in an

5     incorrect and unlawful direction.  SBSD's assessments alluded to, but did not provide operational

6     definitions of or indications of frequency for, perceived autistic "behaviors" and undue prompt

7     dependency.  It did not track whether these issues were getting better or worse with existing

8     services.  Staff failed to supplement brief school observations by looking at readily available data

9     which showed that KA. had become more independent with more complex activities.  Cf. *Val*

10     *Verde Unif. Sch. Dist. v. Parents*, OAH Case No. 2008030801 (2008) (district assessment

11     inappropriate where not all records reviewed).  The District's evaluation of the home program it

12     sought to terminate was even more cursory.  Though SBSD stood eager to take over services

13     previously provided in KA.'s home and community and proposed to do so with just two hours of

14     transition time, no one reviewed those services in enough detail to be able to say how close their

15     own services would be to those they proposed to end.[34]

16         Finally, though it is an essential part of educational assessments that pieces be combined into

17     a whole, no coherent picture emerged from the assessment itself, or from individuals' explanations

18     during KA.'s IEP meetings or at hearing.  Staffers who recommended the same settings wanted

19     very different things done within them.  In their "notes," staff anecdotally and vaguely reported

20     observations while remaining noncommittal regarding their educational implications, while Dr.

21     Schreibman did essentially the opposite.  The bottom line that KA. was not "ready" for inclusion

22     was stark, though it was not clear until hearing that her preference was to supplement, not suspend,

---

23

24         [34] The District opted not to have two of its key witnesses, Dr. Schreibman and Lisa Ryder, even observe KA.'s home program, and no one looked at logbooks with any care.  Staff who saw that KA. talked and played more in her house than in a large group setting failed to recognize either that this might be quite appropriate on her part, or that it might point to the continuing importance of home as a setting for acquisition of difficult new language concepts.  District witnesses differed among themselves and with Dr. Schreibman about whether KA. needed to work 1:1 on areas of language such as grammar, and none had enough information about the ABA language development activities which had played such a large role in her dramatic improvements to formulate clear or substantiated recommendations as to what the next steps should be.

25

26

27

28

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   mainstreaming at HFC, but her behavioral descriptions were unclear and, as it turned out, grossly

2   unrepresentative.  While SBSD's special education director did too much of the wrong kind of

3   planning, other team members did too little.  Information that some had, like that KA. had a vision

4   impairment, failed to inform the recommendations of others.  Though everyone lined up behind the

5   SDC recommendation, their reasons and plans varied.  Dr. Schreibman's goal was to "extinguish"

6   "perseverative behavior" that might be "distinguishing" as KA. got older. (V. 12, p. 3109.) She

7   conceded that she knew of no research suggesting this would be more feasible in a special

8   education setting than in a general education environment, though she thought it might be more

9   "realistic" to expect an SDC to feature the heightened prompting she deemed advisable.

10  Meanwhile, most District staff did not even see self-stimulating behaviors as a concern, and some

11  wanted to introduce visual schedules that Dr. Schreibman thought were unnecessary, and that other

12  witnesses testified would not foster, and might inhibit, KA.'s preparation for kindergarten.

13       **B.**    <u>An IEE conducted by Dr. Caroline Bailey was as appropriate as the District's</u>
14              <u>was flawed, and should be fully, or at least partially, reimbursed.</u>

15       Given their need for an IEE and the District's refusal to authorize one, the family took the

16  common and viable route of obtaining one privately, from Dr. Caroline Bailey, and seeking

17  reimbursement.  (V. 12, at 2811-35.)  For a district to avoid paying for an IEE based on deficiencies

18  in the private assessment, it must show that the assessment failed to meet reasonable agency

19  criteria.  SBSD made no such effort,[35] instead attacking Dr. Bailey's qualifications, invoice and

20  credibility, mainly in ways that were irrelevant, vague and or baseless.[36]  This does not seem to

21  _____

22  [35] Nor, though  KA.'s parents went above and beyond legal requirements in asserting that right, explaining in detail their disagreements and asking whether the District had established any

23  special criteria for IEEs that they needed to follow (V. 12, pp. 2933-35, 3018-21), the response they received provided no guidance regarding any specialized District procedures. (*Id.* at 2995-96.)

24  None were asserted at hearing either.

25  [36] V. 18, pp. 5839-40.  Dr. Bailey's self-characterization as an "educational consultant" uses the same terminology used by SBSD on its IEP notice to describe Dr. Schreibman's role, V. 12, p.

26  3209, who also did no work in this case that required licensing.  The claim that work "appeared to relate to legal consultation services" was unsubstantiated and inconsistent with the only evidence in

27  the Administrative Record, Exh. 8X1, which was not included with the documents forwarded by the District and is attached to KY.D.'s declaration accompanying this motion as Exhibit C.  The charge

28  that Dr. Bailey did not "independently" think of seeing KA. at church, which she did the Sunday

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   have worked: Judge Lepkowsky found Dr. Bailey's information helpful, and cut off efforts to get to

2   the bottom of minor discrepancies about what she reported and what staff acknowledged having

3   said.   Instead, she appears to have put quotation marks around "assessment" in referring to Dr.

4   Bailey's work because by failing to include standardized testing, it fell short of what she incorrectly

5   saw as the "legal standard" for a "formal assessment." (Exh. A, p. 29 ¶ 85; p. 30 ¶ 91; p. 31 ¶ 94.)

6        In fact, though the family is not required to prove any of this given the District's failure

7   successfully to assert any of the handful of defenses to IEE reimbursement, Dr. Bailey performed

8   exactly the kind of IEE needed here, she was qualified to do so,[37] and she did it very well.  Though

9   Dr. Bailey carefully reviewed KA.'s educational records and observed all relevant environments so

10  that she could compare KA.'s performance across settings and predict, albeit cautiously, how she

11  would likely respond to the mix of settings proposed by the District.  She realized that KA.'s visual

12  attention and gaze differences could reflect either autism or visual atrophy and that in neither case

13  did they warrant educational segregation.   She collected information from parents, a required

14  component of assessment.  As necessary, she focused on current needs needed to develop a current

15  IEP, not hypothetical future needs.  *Montgomery County Pub. Sch.*, 40 IDELR 59 (Maryland SEA

16  2003) (attached as Exh. D).   In contrast to Dr. Schreibman's brief, conclusory letter, which failed

17  to set forth in any detail observations and interview notes underlying her recommendations, Dr.

18  Bailey wrote a long, detailed report showing KA.'s strengths as well as deficits and providing other

19

20  before she was to testify on Monday morning—having already written about transition issues and
    seen KA. in her other major environments, V. 12, pp. 2811, 2832, 3106—is insulting and baseless.

21     [37] It is not clear whether OAH deemed Dr. Bailey's lack of a license significant.  It is not.
    Evaluators must be "qualified" rather than have any particular credentials or licenses.  34 C.F.R. §

22  300.502(a)(3)(i).  Dr. Bailey's decision not to pursue a license immediately did not reflect badly on
    her or limit her ability to do what was needed.  She could have done standardized testing under the

23  guidance and license of someone with a license, had any been needed, which none was.  Though

24  early in her career, Dr. Bailey had outstanding academic credentials and extensive clinical experience
    (V. 16, at 5263-70).  She was knowledgeable about autism, early childhood education, language

25  development and inclusive educational practices, and made firm, substantiated and almost entirely
    uncontradicted statements regarding the state of research on autism and on segregated vs. inclusive

26  educational placements for preschoolers with this disability.  Her report took into account research,

27  and she laid the groundwork for the admission at hearing of  key articles located at V. 16, pp. 5021-
    42.  She was well-trained in techniques for systematic observation and detailed reporting of

28  interview and other results.

1   key information.[38]  The ALJ noted that Dr. Bailey and other family witnesses were "useful in

2   providing an overview of Student's present level of language and social interaction." (Exh. A, at

3   25.)  Dr. Bailey's evaluation was one source of information on the class size and transition issues,

4   and helped constrain the District's ability to mischaracterize the program.  The IEE generated

5   probative evidence, much of it on subjects Judge Lepkowsky did not need to consider in detail in

6   light of her narrow ruling on the appropriateness of the District's program for KA.

7       Although the primary basis for rejecting IEE funding appears to have been concern that this

8   was a mere "observation" which cannot objectively be judged, Judge Lepkowsky also seemed to be

9   disturbed by its cost, and though the District put on no evidence that charges were excessive,[39]  she

10  may have responded to her perception that they were by denying all reimbursement.  It was

11  improper to take virtual "administrative notice" that Dr. Bailey's bill was excessive: there was

12  evidence supporting the bill and none to the contrary; if it was too high, the appropriate course was

13  partial, not zero, reimbursement.[40]  OAH's approach denied due process[41] and yielded information

14

15  _____

16  [38] Not only were her key observations undisputed, but her detailed accounts of conversations and scenes allowed incorrect assumptions, diverging memories, and competing views to be identified and corrected.  In contrast, Dr. Schreibman's summary format left the family at the mercy of her memory as to the many important points she omitted, and it was not clear until late in her testimony that she was endorsing an "offer" which had never actually been made.

17

18

19  [39] It was up to the District to put on evidence regarding the reasonableness of IEE costs, and it did not.  Saying Dr. Bailey has an interest in her rate is a far cry from refuting her testimony that it was customary.  Nor, other than asking "really?" did the District cast any doubt on Dr. Bailey's time account, or reveal how long staff had taken in their own much less rigorous review of KA.'s situation.  If SBSD knew of some cheaper way to fill IEE purposes, it passed up clear opportunities to tell the parents when they expressed their disagreements with the District's assessment and asked for information regarding SBSD's IEE processes. (V. 12, pp. 2933-36 & pp. 3018-21.) District counsel's response suggested no alternatives and specified no cost limits. (V. 12, pp. 2995-96.)

20

21

22

23  [40] The bill has now been reduced by Dr. Bailey to $8,000, as explained in the accompanying declaration of KY.D.  It would be helpful to the family to be reimbursed for the amount on which they are making payments, or preferably of course, enough to allow them to cover the entire invoice. (Exhibit C, ¶ 11.)

24

25

26  [41] Not only is legal research not an appropriate way to analyze reasonableness of a cost incurred by a family, but the fact that this was done while writing a decision, without notice that this "evidence" was being considered, deprived the family of an opportunity to respond.  The family put on evidence regarding costs and would have had an opportunity to rebut any contrary evidence by the District; the posture in which OAH's cost comparisons came up denied this opportunity.

27

28

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1  of limited relevance.[42]  Though there are many problems with using orders in other cases in lieu of

2  evidence in this one,[43] the chief one is that the testing at the center of many IEEs is much quicker

3  than what Dr. Bailey did.  Indeed, since outstanding gains in standardized tests requiring her to

4  apply acquired knowledge to novel test questions had already failed to defuse the District's

5  ostensible "generalization" concerns, the only way to counter an observation-based assessment was

6  with broader, more careful and better documented observations, placed in context of student data

7  and research.  It is easy now to second-guess Dr. Bailey's level of detail; however, that precision

8  would have been critical had Dr. Schreibman not so drastically changed course.[44]  All evidence in

9  the record supports the reasonableness of Dr. Bailey's charges.  She testified without contradiction

10  regarding her hourly rate and the time spent on this case.  She observed KA. at school, a park, home

11  and church, and saw each part of the proposed placement.  She wrote a detailed, careful account of

12  her observations and attempts to gather information from those with whom she interacted.  Given

13  both the need to understand KA.'s trajectory and the need to provide IEE information that was

14  relevant to the issues for hearing, she carefully reviewed KA.'s records, and was able to see that

15  KA.'s current progress was not some surprise that could not have been anticipated at KA.'s IEPs

16  last spring, and thus could be excluded on the authority of *Adams v. Oregon*, 195 F.3d 1141, 1150

17  (9th Cir. 1999), but rather than the predictable next phase  of a well-conceived, well-implemented

18

19  [42] Just how limited is not clear: we know OAH reviewed a "sampling" of "about 15" orders,
20  but not which, when they were issued, anything about the facts or whether the IEEs sufficed.
    [43] For instance, Judge Lepkowsky apparently looked at orders, not bills, yet inferred that Dr.
21  Bailey's invoice was unreasonable because it exceeded awards.  Perhaps other defendants put on
    evidence about costs.  To deny reimbursement altogether does not follow.  Moreover, IEEs have
22  probably become more expensive since *Arlington v. Murphy* made it newly imperative to ensure that
    expert work occurred as part of IEEs if possible, because costs could no longer be collected as part of
23  legal fees.  *Schaffer v. Weast*, which shifted the burden of proof to parents in most special education
24  disputes, made it necessary for independent evaluators to devote more critical attention to District
    programs and often to gather information needed to "prove the negative," a new burden that has
25  increased data-gathering needs.  Finally, IDEA 2004's new focus on peer-reviewed research makes it
26  imperative for evaluators to bring current research to bear on their reviews of district programs and
    to ensure their own proposals are valid.  For these reasons and more, criticizing Dr. Bailey's bill in
27  light of a "sampling" of prior decisions is unreliable.
    [44] As the District's only nonemployee witness and a prominent, amply funded researcher,
28  whose CV is at V. 16, at 5605-40, her views were likely to, and did, carry much weight.

21                                                08-cv-00622-W (POR)

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   early intervention program. That these activities take time is suggested by the fact that no one on

2   the District side did anywhere near as much to understand KA.'s needs as Dr. Bailey did, and she

3   brought to bear research and concrete information about KA.'s history and placement options that

4   none had taken into account. That they are vital can be seen from the holes in the District's

5   assessment. No one really knew much about KA. and transitions, except the gentle, familiar ones at

6   HFC. Dr. Schreibman knew almost nothing about the District's 1:1 teaching, and Dr. Ring was not

7   called to share what she knew. Though the rationale for in-home instruction is that KA. is learning

8   much of her new language from 1:1 teaching in the quiet, non-distracting environment of her home,

9   neither Dr. Schreibman nor the District's speech and language pathologist saw these activities or

10   knew what they were, putting them in no position to evaluate their continued necessity (which did

11   not stop either from endorsing their cessation). (V. 8, p. 1793 l. 6 – p. 1794, l. 2.)

12       **C.**    **The rules suggested by OAH's IEE ruling would create unfortunate incentives**

13                 **for families and school districts alike.**

14       The new rules intimated in this decision will, if not repudiated on appeal, make assessment

15   planning—now an area in which even parties with underlying service disagreements can often work

16   together—far more contentious. They would  reward gamesmanship and penalize parties who

17   cooperate in information-gathering. Parents should be able to sign assessment plans in confidence

18   that IEE rights will be honored or, if necessary, enforced; the unusual holding here removes

19   parents' historic incentives to cooperate, and creates the opposite.[45] Parents would be encouraged

20   to obtain standardized testing whether or not it is necessary lest an assessment be deemed a mere

21   "observation" or found to fall short of "legal standards," and to press for conciseness over

22   thoroughness.[46] Incentive shifts on districts' sides would be even more damaging. There would be

---

23       [45] Until now, parents have been well-advised to consent to observations, because doing so

24   may bring about better services and more agreement, failure to do so risks being found
    uncooperative, and findings can, if necessary, be countered through independent observations.

25   Under the rules here, parents may decide the risk of looking noncooperative pales compared to that
    of being confronted with powerful expert opinions and no funding to seek countervailing views.

26       [46] Since long, detailed reports that let readers draw their own conclusions might lead a

27   hearing officer to suspect waste or padding, independent assessors could rationally shift to writing
    reports more like Dr. Schreibman's, reducing the utility of required pre-hearing disclosures and the

28   capacity of those disclosures to result in settlements.

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1   powerful incentives to bypass standardized testing and interview instruments (which come with

2   instructions for administration and are validated for specific purposes) and rely instead on

3   impressionistic observations by individuals (who, in the absence of any potential accountability,

4   may operate on fragmentary information, document selectively what they see and the opinions they

5   form, and "forget" what they do not write down).  OAH's ruling encourages districts to ignore

6   parent requests for IEE information and file for hearing without actually engaging on the narrow

7   issues IDEA makes relevant.

8   **IV.**   **OAH ordered insufficient remedies for overly restrictive and inappropriate offers.**

9        **A.**   **OAH should have ordered SBSD to continue KA.'s existing support unless and**
             **until it elected to provide this support internally or with another nonpublic**

10         **agency.**

11       Though recognizing that KA. had a right to stay at HFC and needed support there, and

12   ordering that she be allowed to remain and that the family be reimbursed for tuition, OAH gave the

13   District 30 days to take over using Coyne or otherwise.  SBSD took them all, forcing KY.D. and

14   B.D. to bear costs that were inconsistent with KA.'s right to a <u>free</u> appropriate public education.[47]

15

16        **B.**   **Plaintiffs were denied reimbursement for educational services provided by KA.'s**
             **mother, who provided direct instruction services that should have been provided**

17         **by SBSD.**

18       When SBSD failed to specify what would be done during "extended day" hours, KY.D.'s

19   growing competence in  ABA let her temporarily add formal 1:1 teaching to her intense "mother"

20   role in KA.'s program.[48]  Though appropriate relief includes reimbursement to parents for time they

21   spend personally providing services that agencies wrongly deny, *e.g. Bucks County Dept. of Mental*

22   *Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61 (3d Cir. 2004); *Hurry v. Jones*, 734 F.2d

23   879 ) (1st Cir. 1984) (parents paid for driving services); *Straube v. Florida Union Free Sch. Dist.*,

24

25       [47] A declaration from KY.D. describing expenditures, the hardship they posed, and the
     family's failed attempt to secure correction of what seemed an inadvertent gap is attached as Exh. C.

26       [48] KY.D. 's CV is at V. 16, pp. 5272-73.  She provided 36 hours of ABA services (six per

27   week) from September 1, when last year's settlement expired, through October 15, when alternative
     funding was secured.  She exceeded minimum direct service staff requirements.  She requested the

28   normal rate for 1:1 services ($50/hour) or at a minimum her likely take-home rate ($20/hour).

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1  801 F. Supp. 1164 (S.D.N.Y. 1992), OAH denied relief for three reasons, none persuasive.

2  OAH's limitation of this relief to situations where alternative providers are "unavailable" is

3  unwarranted. *Bucks County*, the parent reimbursement case cited by OAH, required very little

4  showing that alternative resources were unavailable near Philadelphia, and such a requirement is

5  inconsistent with its rationales. It is hard to imagine a case where services are not available at some

6  price. There is no policy reason to promote paying agencies over self-help: as in the early months

7  of this case, parents who are forced to do more than should be their role can gain valuable skills,

8  and having parents provide their own interim services is likely to reduce ultimate reimbursement

9  bills. Limiting compensation to families which spend money rather than cultivating skill and

10  devoting effort aggravates the socioeconomic bias inherent in reimbursement remedies.

11  Though OAH was correct that "implementation of ABA concepts in an autistic child's home

12  after the child's parents have received training, appears to be one of the foundations of ABA

13  therapy," this does not justify denying parents relief when they do what districts should have. Case

14  law distinguishes between the normal parent roles in ABA program and the roles that parents are

15  sometimes forced to assume when districts default, as did witnesses in this case. KY.D. has risen

16  to the challenge of being KA.'s mother;[49] she is requesting payment for hours of formal

17  programming that was done by tutors before and after her temporary takeover. (V. 5, pp. 1121-24.)

18  Reimbursement should not have been denied on the grounds that KA. could have been

19  appropriately served through school-based ABA. This service was more likely than not

20  inappropriate regardless of where KA. was spending her school days, and once two-thirds of her

21  day had been found inappropriate, going to the SBSD site simply for extended day activities made

22  far less sense than continuing to have a much smaller part of her program than before at home,

23

24  [49] KY.D. plays a major role in structuring all of her daughter's activities. At the time of hearing she had given up paid employment. She was providing daily consequences based on
25  preschool performance. She was taking KA. to speech and language therapy and implementing suggestions from Ms. Ryder and other trainings. She was arranging play dates. She was meeting
26  regularly with staff to go over ABA data and fine tune her "mothering" activities. She was working with other parents to improve SBSD services. During hearing, she was about to be released from a
27  long stint as KA.'s aide in a Sunday School class where own mother was the teacher. Unfortunately,
28  the District's handling of KA.'s education made advocacy a significant task in its own right.

PLAINTIFFS' REQUEST THAT DECISION BE IN PART SUSTAINED AND IN PART REVERSED

1    where she could continue to work on difficult, stressful tasks and have her language corrected in

2    private, and where play dates could continue to enrich her social interactions with classmates.[50]

3 **CONCLUSION**

4       For KA.'s parents, fascinating as it would be to embark on discovery in the Section 504

5    matter as to why SBSD has dealt so wastefully and unlawfully with their daughter and them, they

6    would much prefer to see this case end, in a way that will encourage SBSD to work more openly

7    and collaboratively in the future. This case needs to end with an affirmance of OAH's compelling

8    findings as to KA.'s right to be educated in general education environments with natural

9    proportions of children with and without disabilities, and with social interactions and daily

10    transitions that are reasonable given her age and disability, and, for that matter, our shared

11    limitations as human beings. IEE funding and the other reimbursements being requested would

12    ease the financial burden that lingers from this dispute. It is important for these parties and others

13    to make clear that predetermination is hard to prove, it is not impossible under circumstances as

14    egregious as those here.

15

16    DATED: 27 April 2009        /S/MAUREEN GRAVES, ESQ.
                                        Maureen Graves, Esq.

17                                         Attorney for Plaintiffs

18                                         KA.D., a minor, by her mother, KY.D., as her next f riend;
                                        KY.D.; and B.D.

19

20    [50] OAH erred on several grounds: 1) the decision to remove in-home services was a product of

21    unlawful predetermination for which relief in the form of reimbursement is warranted; 2) OAH
      departed from the preponderance standard by stating repeatedly that plaintiffs had failed to present

22    "compelling" evidence that Ka. could not benefit from school-based District ABA and required in-
      home services; 3) OAH failed to recognize that receiving services at home—alongside her parents,

23    grandparents and sister and, as acknowledged by the District, in "play groups and social situations"
      was less restrictive than being behind a partition in a special day class for three years olds, with the

24    only meaningful "school" aspects being adult interactions that could occur anywhere, possible peer
      activities that might involve students with or without disabilities, and likelihood of incidental

25    exposure to negative behaviors by other students deemed to need 1:1 teaching (AR, V 18, Exh. 25, at
      5828 ll. 4-11); 4) OAH erred by allowing the District to replace KA.'s highly effective home

26    program with a set of activities which it refused to describe with any clarity or consistency, 5) OAH

27    erred by allowing competent ABA to be replaced with providers who had been shown more likely

28    than not unable to serve KA. effectively. (E.g., V. 5, pp. 1062-75; V. 8, pp. 1885-93; 1917-18.)

25

# EXHIBIT A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>                Petitioner,<br><br>v.<br><br>SOLANA BEACH SCHOOL DISTRICT,<br><br>                Respondent. | OAH CASE NO.  N 2007070255 |
| SOLANA BEACH SCHOOL DISTRICT,<br><br>                Petitioner,<br><br>v.<br><br>STUDENT,<br><br>                Respondent. | OAH CASE NO.  N 2007090146 |

## DECISION

Darrell Lepkowsky, Administrative Law Judge (ALJ), Office of Administrative Hearings (OAH), Special Education Division, State of California, heard this matter on the ten business days between October 29, 2007, and November 9, 2007, with the eleventh and final day of hearing held on November 19, 2007, at the offices of the Solana Beach School District in Solana beach, California.[1]  The hearing was open to the public, at the request of Student's parents.

---

[1] The hearing was originally scheduled to begin on October 22, 2007.  Due to the fires in San Diego County, the hearing was postponed a week.

Attorneys Maureen R. Graves and John G. Nolte represented Student and her parents. Student's mother was present throughout the hearing. Student's father was occasionally present.

Attorney Jonathan P. Read, of Fagen, Friedman & Fulfrost, LLP, represented the Solana Beach School District (District). Mary Ellen Nest, the District's Director of Pupil Services, was present throughout the hearing.

Student filed a request for due process on July 10, 2007. The District filed a request for due process on September 7, 2007. The District's unopposed motion to consolidate the two cases was granted on September 14, 2007. Applicable timelines for the cases were deemed to begin running from the date the District's due process request was filed. At the due process hearing, the ALJ received sworn oral testimony and documentary evidence. At the conclusion of the hearing, the parties agreed that the record would remain open in order for the parties to submit post-hearing closing briefs and reply briefs. Both parties timely filed their closing briefs on December 17, 2007. Student timely filed her reply brief on December 24, 2007. The District filed its reply brief on December 26, 2007. The ALJ closed the record and deemed the matter submitted as of December 26, 2007. The parties stipulated to tolling the time in which a decision was due until January 7, 2008.

## ISSUES[2]

1.      Whether the District denied a free appropriate public education (FAPE) to Student for the 2007-2008 school year and 2008 extended school year by:

A.      Predetermining its offer of placement and related services.

B.      Failing to consider all relevant data concerning Student, including input from her parents, before making an offer of placement and related services.

C.      Failing to offer an applied behavior analysis (ABA) therapy program that meets Student's unique needs because it is not scientifically based and supported

---

[2] During the hearing, Student withdrew as a separate issue her contention that the District denied her a FAPE by failing to ensure Dr. Laura Schreibman's presence at all of Student's individualized educational plan team meetings during the time in question. Additionally, Student originally raised the issue, in her complaint and at the prehearing conference, of the District's alleged failure to develop an appropriate plan to transition Student from her current educational program to the program offered by the District. However, Student did not present any evidence addressing this issue at hearing and Student does not address it in her closing brief. The only reference to a transition plan in Student's brief is a one-sentence reference to the fact that the District's proposal for two hours of consultation between its staff and Student's present providers of applied behavioral analysis services is insufficient. This issue is therefore not addressed in this decision. Finally, the issues have been restated in accord with the evidence presented at hearing and the arguments offered by Student in her briefs.

by peer-reviewed research, to the extent practicable, is not offered in a home environment, and fails to provide a sufficient amount of therapy hours.

        D.     Offering a placement for a portion of Student's school day in a special day class that does not incorporate adequate ABA principles, fails to include peers with compatible instructional needs, and which is not the least restrictive environment for Student.

        E.     Offering a placement in a District general education classroom for a portion of Student's school day that is an inappropriate instructional setting for her and whose addition to Student's program creates a school day that includes too many transitions between classroom settings.

        F.     Failing to provide staff capable of implementing the individualized educational plan (IEP) offered by the District.

    2.     Are the District's assessments of Student with regard to her educational placement appropriate and, if not, is Student entitled to reimbursement from the District for the independent assessment conducted by Dr. Caroline Bailey?

REMEDIES SOUGHT BY STUDENT

        Student seeks District funding of 34 hours per week of direct ABA therapy, through her present provider, Coyne & Associates (Coyne), with the hours to be divided between student's private preschool, her home and in the community. Student also seeks 16 hours per month of ABA supervision, also through Coyne, and payment for two hours per month of ABA clinics, attended by Student's educators, aides, and ABA providers. Student also seeks reimbursement to her mother for time her mother spent providing ABA therapy to Student in their home. Student also seeks reimbursement for the cost of her tuition at the Hanna Fenichel preschool for the 2007-2008 school year, which has already been paid by her parents, along with an order for prospective placement at Hanna Fenichel with one-on-one aide support from Coyne for all hours Student is in attendance, for the remainder of the 2007-2008 school year. Finally, Student seeks reimbursement for the services provided by Dr. Bailey, including her observations, time spent researching and reviewing Student's records, and time spent preparing her report.

CONTENTIONS OF THE PARTIES

    The main thrust of the dispute between Student and the District in this case is where Student should be educated in order to prepare her for entering a general education Kindergarten class in the fall of 2008. The parties do not dispute that Student should spend at least some of her time in a preschool classroom with typically developing peers. They do dispute, however, whether a District placement is appropriate to meet Student's unique

3

needs. With regard to the provision of one-on-one ABA services, the parties do not dispute that Student presently requires an aide during any time she spends in a typical general education class. Nor do they dispute that Student requires at least some direct individual ABA therapy. Rather, they dispute who is to provide the ABA aide and services, the amount of direct services Student requires, and if direct services should be provided at Student's home or at the District's preschool campus.

Student contends that the District committed procedural violations of the reauthorized Individuals with Disabilities Educational Act (IDEA) during the IEP process by predetermining her placement in the District's preschool and predetermining that Student no longer required that her present amount of ABA services continue in her home. Student also contends that the District failed to consider all relevant data concerning Student, including input from her parents and Coyne, before making an offer of school placement and related services, and failed to offer a program that is scientifically based and supported by peer-reviewed research, to the extent practicable. Student further contends that the IEP offer is substantively defective because it fails to meet her unique needs. Student contends that the District's offer does not include provision for sufficient direct ABA[3] instruction, fails to include peers with compatible instructional needs, and includes too many transitions between classroom settings. Student further asserts that the District's offer of placement for part of her day in a special day class (SDC) is not the least restrictive environment (LRE) for her. She also contends that the offer of placement in the District's general education classroom for the other portion of Student's school day is inappropriate due to the structure of the class and, in particular, the amount of students in it. Student further contends that District staff is not capable of implementing the District's proposed IEP. Finally, Student contends that the District failed to assess her appropriately and that she is therefore entitled to reimbursement for the services of Dr. Caroline Bailey, including all time spent on observations, review of records, research, and for preparation of Dr. Bailey's extensive report.

The District contends that it did not commit any procedural or substantive violations of the IDEA. It asserts that the evidence fails to support Student's contention that the

---

[3] As explained by District expert Dr. Laura Schreibman, ABA, as an intervention for the treatment of autism, is often associated with specific behavioral methods, such as: discrete trial training (DTT); intensive behavioral intervention; incidental teaching; pivotal response training; and verbal behavior analysis. A discrete trial is a single cycle of a behaviorally-based instruction routine. A particular trial may be repeated several times in succession, several times a day, over several days (or even longer) until the skill is mastered.

The method and technique of ABA therapy requires that targeted behaviors be reduced to their most basic elements, and that the child is then trained by repetitious drilling in the redirected behaviors desired. Contextual factors, established operations, antecedent stimuli, positive reinforcers, and other consequences are used, based on identified functional relationships with the environment, in order to produce practical behavior change. Negative behaviors are generally ignored. Prompts or other assistance are timed and provided to assure correct responses, and then gradually "faded" to establish independence. The child is then urged to repeat each task until it has been learned. Overall, the treatment focuses primarily on developing language, increasing social behavior, and promoting cooperative play with peers along with independent and appropriate toy play. Concurrently, substantial efforts are directed at decreasing excessive rituals, tantrums and aggressive behavior.

District predetermined its offer of placement to her or failed to consider relevant information about Student from her parents or other sources. It further contends that the educational program offered to Student at the June 13, 2007 IEP team meeting provides Student with educational benefits and permits her to progress in the curriculum. The District contends that the teachers, aides, and service providers on its staff are capable of addressing all of Student's educational needs. The District further asserts that its offer of placement for part of Student's day in its SDC, and for part of Student's day in one of its general education preschool classes, was an appropriate offer for Student and was the least restrictive environment for her. The District further contends that Student does not require more than 10 hours a week of ABA therapy. Finally, the District asserts that Student is not entitled to reimbursement for the services of Dr. Bailey. The District asserts that Student's parents failed to disagree with the assessments conducted by the District, a prerequisite to their entitlement to an independent educational evaluation (IEE). In the alternative, the District offers that its assessments all met appropriate legal standards. The District therefore denies that it violated Student's rights under the IDEA or that she is entitled to any of the remedies she has requested.

## FACTUAL FINDINGS

*Background Information*

1.      Student is presently just over four-and-a-half years old. She was born on April 24, 2003. At all times relevant to the allegations in this case, she resided with her parents within the District's boundaries. Student is eligible for special education and related services based upon a diagnosis of autism. Her eligibility for special education services is not at issue in this case.

2.      Student's parents and grandparents started noticing that Student was failing to develop appropriately when Student was around two years old. They noticed that Student's eye expression was "flat." Student was not showing any interest in talking, was not babbling, as would a normal child, had no eye contact, and showed no interest in others. Student's medical providers diagnosed her with severe autism and referred Student's parents to the San Diego Regional Center. The Regional Center eventually evaluated Student, determined that she suffered from developmental delays, including speech and language delays, and found Student eligible to receive services. Observations by the Regional Center noted that Student failed to interact with others, engaged in minimal eye contact with others, failed to respond to basic commands or to her name, would run out of the house, exhibited some aggressive behaviors, was prone to tantrums, and exhibited some stereotypical autistic behaviors, such as spinning and hand movements. The Regional Center found that Student's educational needs were severe and that her behavioral needs were moderate. The Regional Center contracted with Coyne, which is certified by the state of California as a non-public agency (NPA) to provide the ABA services to Student.

3.      Once Student was diagnosed with autism, her mother became an active participant in researching information and treatments on autism and personally learning techniques which Student's mother could implement herself with Student. Mother's research on the internet in the summer of 2005, led her to the Brent Woodall Foundation.[4] The foundation evaluates children for autism and recommends treatments and sources of assistance for parents. Tracey Woodall runs the Foundation, which is based in Texas. Student and her mother flew to Texas in August of 2005. Ms. Woodall administered the Assessment of Basic Language and Learning Skills to Student to assess Student's present developmental levels and to assist in educational planning for Student. The assessment indicated that Student demonstrated severe cognitive delays. However, the assessment and observations of Student indicated that she was able quickly to acquire tasks that did not require language comprehension. The assessment also indicated Student had profound receptive and expressive language delays and that Student did not then possess any functional social skills. Student also demonstrated delays in self-help skills, as well as self-stimulatory behaviors stereotypical of autism, such as wiggling her fingers.

4.      During the four days Student and her mother were in Texas, the Woodall Foundation provided Student with 32 hours of ABA therapy and provided Student's mother with intensive parent training. Student responded extremely well to the therapy, progressing more in the four days than expected. Ms. Woodall recommended that Student receive at least 30 hours per week of one-on-one direct ABA therapy services.

5.      Although the Regional Center did not agree to fund the 30-hour a week program recommended by Ms. Woodall, it did contract with Coyne to provide approximately 12 hours a week of in-home ABA services to Student starting in September 2005. Except for the number of recommended hours, the Coyne services mirrored the recommendations made by Ms. Woodall. Coyne provided a parent training component as well. Within a short time after the Coyne services began, Student's mother noted a marked improvement in Student's behavior and development.

6.      The Woodall Foundation administered another set of assessments to Student in December 2005. The assessment noted that in the four months or so that Student had been receiving ABA services, Student's speech and language skills had progressed exceptionally well, rising in just four months from profoundly severe to moderately severe.

7.      Planning for Student's transition from early start services to educational services to be provided by the District occurred in the spring of 2006. Prior to the meeting, Student was assessed by the District in the areas of psycho-motor development/perceptual function, language/speech/communication development, cognitive functioning,

---

[4] His widow, Tracey Woodall, founded the Brent Woodall Foundation in his memory after he was killed in the World Trade Towers on September 11, 2001. Student's mother was drawn to the website because she had known Brent Woodall in college.

social/emotional adaptive behavior, and health. Coyne also did its own psychological assessment of Student about the same time the District conducted its assessments of her, as part of the Regional Center's ongoing provision of services to Student.[5]

8.      Student's initial IEP with the District was held on March 31, 2006. The IEP team noted that Student was highly responsive to a structured environment. She was beginning to show strong pre-academic skills (she was able to count to 12), and could answer basic questions about herself and her family, such as her name and her sister's name. However, the assessments indicated, and the IEP team agreed, that Student demonstrated significant deficits in the areas of receptive, expressive and pragmatic language. Student communicated primarily using one-word utterances (she was able to often spoke jargon and engaged in echolalia.[6] Although Student was approximately 34 months old at the time she was assessed, the assessments indicated she had a vocabulary comprehension of a child between the ages of 15 and 16 months. At a level of between 20 and 21 months, Student's expressive vocabulary was also significantly below her actual age level. Student also demonstrated significant social/emotional deficits. The IEP team noted that she felt overwhelmed in large groups and would withdraw. Student continued to demonstrate fleeting and limited eye contact, and was noted to withdraw during group activities with peers. The IEP team also noted that Student's diagnosis of autism caused the indicated delays in communication and social skills and that Student was currently unable to acquire new skills through observation or group instruction.

9.      As a result of Student's assessments and discussions with the IEP team on March 31, 2006, the District offered Student the following placement and services: placement in a District special day class for 240 minutes a day, 120 minutes of which would be individualized direct instruction; individualized direct instruction for an additional two hours per day, five days a week; speech and language services three times a week for 30 minutes each session; and occupational therapy/speech group one time a week for a 45-minute session. The District also proposed up to 25 hours of consultation between Coyne and District staff to transition Student's ABA program to the District. Student's parents agreed with the IEP team's determination of Student's present levels of performance, and with most of the goals developed for her. However, they did not agree with the District's proposed placement and proposal for provision of ABA services. Specifically, Student's parents believed that Student did not belong in a SDC and believed that Coyne should continue providing ABA services to Student in their home.

10.     Coyne referred Student's parents to the Hanna Fenichel preschool. Hanna Fenichel is a community preschool serving typically developing preschool students. The state of California has not certified it as a non-public school (NPS). Student's parents were

---

[5] On April 21, 2006, the Regional Center found that Student continued to be eligible for its services.

[6] American Heritage Dictionary defines echolalia as the immediate and involuntary repetition of words or phrases just spoken by others, often a symptom of autism.

very impressed by the school and decided that they would enroll Student there beginning in the fall of 2006. They also filed a due process complaint against the District based upon their disagreement with the placement offered by the District. The parties settled the due process complaint in the summer of 2006. By the terms of the settlement, which covered the 2006-2007 school year, Student received a total of 25 hours a week of ABA services to be provided by Coyne. The 25 hours consisted of 19 hours a week of direct instruction in Student's home and six hours per week of a one-on-one aide for Student while she attended Hanna Fenichel two days a week. The settlement agreement also provided for supervision of the ABA program at home and at Student's preschool. Additionally, Student received two 45-minue sessions of speech and language therapy at the District preschool site as well as an hour a month of occupational therapy consultation between Student's mother and a District occupational therapist. At hearing, the parties did not enter into evidence this settlement agreement. It is also unclear from the testimony at hearing exactly who funded the placement and services.

11.     After signing of the settlement agreement, Student's parents had little contact with the District until February 16, 2007, when Student's IEP team first met to begin the process of developing the IEP for Student's 2007-2008 school year. The IEP team held meetings on February 16, 2007, May 11, 2007, and June 13, 2007. It is the offer made to Student by the District as a culmination of these meetings, the events leading to that offer, and observations conducted of Student to help the District determine its offer, which form the basis of the complaints that are at issue in this hearing.

*Procedural Violations That May Constitute a Denial of FAPE*

12.     A school district must comply both procedurally and substantively with the IDEA. While not every procedural flaw constitutes a denial of FAPE, procedural flaws that inhibit a student's right to receive a FAPE, significantly inhibit a parent's opportunity to participate in the IEP process, or cause a deprivation of educational benefit to a student will constitute such a denial. A school district may commit a procedural violation of the IDEA if it comes to an IEP meeting without an open mind and several options to offer for discussion with all team members, or refuses to consider the input of a student's parents or other relevant data her parents may have. A district fulfills its obligation in this regard if it does suggest different potential placements, and discusses and considers any suggestions and/or concerns a parent has concerning the child's placement. However, participation by the parents must not be mere form over substance; participation in the IEP process must be meaningful.

13.     A school district is also required to make a formal written offer that clearly identifies its proposed program. However, it is proper for district IEP team members to discuss among themselves the parameters of programs available to a student and to write a draft of a program they may want to discuss with a student's parents. Furthermore, parents do not have a right to their choice of placement or choice of service providers, as long as the district's choice of program or providers offers a FAPE to the student.

8

*Predetermination of Educational Placement*

14.    Student contends that the District had already predetermined to place her in a special day class at its preschool before it participated in the IEP meeting on May 11, 2007, and therefore denied her parents an opportunity to participate in the IEP process, resulting in a denial of FAPE to her.  Student bases her assertion on conversations Student's mother had with District Director of Pupil Services Mary Ellen Nest prior to the May 11 meeting, on the fact that District witnesses acknowledged having discussed Student's IEP before the May 11 meeting, and based upon Student's assertion that the District refused to consider continued placement for her at Hanna Fenichel.

15.    The IEP team considered the meeting the parties held on February 16, 2007, to be a "pre-meeting."  The main purpose of the meeting was to determine which assessments the District would administer to Student and to arrange observations of her.  At this meeting, the District prepared an assessment plan for Student that included formal assessments in the areas of speech and language and vision, observations of Student and a review of her records, by a District behavior specialist and school psychologist, and by an outside evaluator.  Student's mother signed agreement to the assessment plan on February 19, 2007; she later added that she was also requesting a Social/emotional and adaptive behavior assessment.

16.    Jodie Reise, a behavior specialist for the District, observed Student for an hour at her preschool on March 13, 2007.  At school, Ms. Reise observed that Student would play alongside her peers but did not initiate play herself.  Her one-on-one aide facilitated all her interaction with peers.  Student did not comply with her teacher's prompts to go to circle time; she responded when prompted by her aide.  Ms. Reise observed that Student did not respond to questions specifically on topic and did not always use complete sentences in her responses.  However, Student was quiet and attentive during the circle time.  Ms. Reise also observed that Student was able to choose activities independently and remain engaged in them.  Ms. Reise's observation notes did not make any recommendations about placement or related services for Student.

17.    Ms. Reise then observed Student at Student's home for two hours on March 23, 2007.  Ms. Reise noted that Student engaged in a significant amount of imaginary play at home, used pronouns in her speech, and answered "who, what, where" type of questions when asked by her one-on-one ABA aide who was giving Student a session during Ms. Reise's observation.  The aide also worked with Student on recalling detailed information.  Ms. Reise noted that Student knew all the upper case letters and was working on learning the lower case letters.  Student was attentive while listening to a story and answered questions about it that her aide posed to her.  Ms. Reise observed that Student could rote count to 15, could answer social questions, such as ones about her parents' names, and could identify some words by sight.  Ms. Reise's observation notes of Student while at Student's home also did not make any recommendations concerning Student's educational placement or provision of related services.

18. Dr. Laura Schreibman, a distinguished professor at the University of California, San Diego, who is an autism specialist and was the District's outside evaluator, observed Student for approximately two hours at her preschool on March 22, 2007. School psychologist Sharon Loveman observed Student for an hour and a half at her school on April 3, 2007, and for an hour and 45 minutes at Student's home on April 19, 2007. Ms. Reise and Ms. Loveman hand-wrote their observations but did not make any specific recommendations concerning Student in their observation reports. Dr. Schreibman reduced her observations to a letter written to Ms. Nest in which she also gave her recommendations concerning what she considered an appropriate placement for Student. Dr. Schreibman, who had also observed both a District preschool SDC and a District general education preschool class, found that the District's general education class was then beyond Student's capabilities. She also found that behaviors she observed in Student counseled against continued full inclusion of Student in her present placement at Hanna Fenichel. Rather, Dr. Schreibman recommended a placement for Student in the District's SDC, which also enrolled a number of typically developing peers along with the special education students. The District provided copies of all three of these reports to Student's parents.

19. District School psychologist Sharon Loveman observed Student for two and a half hours at her preschool on April 3, 2007. She observed that Student's general demeanor was relaxed, happy, engaged and alert. However, Ms. Loveman also noted that Student had limited interaction with her peers and, while she played alongside them, Student did not mimic their play and seemed unaware of her peers' shift to play that is more complex. Ms. Loveman noted that Student's response to her instructor's attempts to get Student to initiate interaction with her peers was limited. With regard to Student's use of language, Ms. Loveman noted that Student expressive language was limited, although Student did repeat spontaneously words that she overheard and was able to express emotion and intent. Ms. Loveman also observed that Student was attentive during circle time, was able to choose books to look at and knew that the book was supposed to be read page by page. Student also appeared to understand the routines in the classroom, and did not have difficulty transitioning between activities in the class or from classroom to playground. Ms. Loveman did not make any recommendations in her observation notes concerning placement or services for Student.

20. Ms. Loveman observed Student at Student's home for an hour and forty-five minutes on April 19, 2007. Ms. Loveman observed that Student sought out variation and new learning experiences at home, refusing to do tasks she had already mastered. Student had a high stamina for work and play and was socially engaged and curious during the home observation. Ms. Loveman observed that Student had a strong memory for previously acquired information and demonstrated an extensive and varied vocabulary as it related to a dinosaur book. Ms. Loveman noted that Student at times did take a lot of time to respond to questions, but that Student's expressive language did include the use of adjectives and pronouns. She noted (as later confirmed by Ms. Reise) that Student's verbal expression was significantly more spontaneous at home than at school. Ms. Loveman's observation notes of Student at home did not include any recommendations concerning placement or services for Student.

21.     After receiving Dr. Schreibman's letter, as well as the observations of Ms. Loveman and Ms. Reiss, Ms. Nest discussed Dr. Schreibman's recommendations with both Ms. Loveman and Ms. Reiss, as well as with District speech and language pathologist Lisa Ryder.  Her conversations with each took place separately.  Ms. Nest asked each if she believed that Student should remain in her present placement at Hanna Fenichel.  Each expressed reservations about the placement and the level of prompting Student was receiving at the school, as observed by Ms. Loveman, Ms. Reiss, and Dr. Schreibman.  While Ms. Nest and the other staff members discussed supports and services Student was presently receiving, and what possible supports and services they each believed Student needed, they never discussed or compared program costs, and never discussed whether the District should refuse to consider continuing Student's placement at Hanna Fenichel.  Ms. Nest did not direct any of the staff members to take a particular position on placement nor did she direct that they refuse to consider a placement at Hanna Fenichel.

22.     Coyne also prepared a progress report regarding Student, dated May 1, 2007, in anticipation of Student's annual IEP.  The report recommended that Student continue to receive 25 to 30 hours a week of ABA-related services, divided between Student's home and preschool.  Most significantly, Coyne recommended that Student's education be in a fully included general education class rather than in a SDC, in direct contradiction to the recommendation made by Dr. Schreibman.

23.     Student's mother agreed with Coyne's recommendations.  Since they were contrary to the recommendation of Dr. Schreibman, who Student's mother knew to be a well-known authority on autism, Student's mother became concerned about the conflicts in the two recommendations and how the District would react to the recommendations made by Coyne.  She was very concerned that the District would not consider Coyne's recommendations and that the District would refuse to consider placing Student at Hanna Fenichel for the upcoming school year.  She therefore telephoned Jane Whitney, her educational consultant from the Regional Center, and asked her to call Ms. Nest to inform her of what the Coyne report recommended so that there would be no surprises at the IEP meeting, which had recently been scheduled for May 11, 2007.

24.     Ms. Whitney telephoned Ms. Nest per the request of Student's mother.  Ms. Whitney explained what was in the Coyne report, stating that the family wanted to have a streamlined IEP meeting without surprises.  Ms. Nest agreed that there might be disagreement at the IEP meeting since the parties' respective consultants had given contrary recommendations.  Ms. Nest did not make any negative remarks about Student's mother to Ms. Whitney; their conversation was brief and Ms. Nest thanked Ms. Whitney for sharing the family's information concerning the Coyne recommendations with her.

25.     After the phone call from Ms. Whitney, Ms. Nest was convinced that Student's family was going to insist on maintaining Student's placement at Hanna Fenichel with the same level of Coyne services and would refuse to consider placement in a District classroom.  Based upon her conversation with Ms. Whitney, Ms. Nest telephoned Student's mother.  They had a long discussion about the upcoming IEP meeting and about Dr.

11

Schreibman's recommendation that Student be placed in the District's SDC. Ms. Nest told Student's mother that she agreed with Dr. Schreibman's recommendation for a SDC placement although she was not specific during this conversation as to why she agreed with it. This prompted a discussion between the two about the concept of placement in the least restrictive environment, and the opinion of Student's mother that an inclusive placement was more appropriate for Student. Ms. Nest commented that she wanted the IEP meeting to be non-adversarial and they should "agree to disagree." Ms. Nest ended the conversation by stating that if there was no agreement at the IEP meeting the parties could meet afterward and perhaps try to mediate their differences. Ms. Nest did not discuss what opinions other District staff had expressed concerning possible placement for Student.

26.     Student's mother believed that Ms. Nest's conversation with her indicated that the District would not consider a placement at Hanna Fenichel. She called Ms. Whitney to voice her concerns and, ultimately, wrote to the District's Superintendent to express her concern that the District had predetermined Student's placement for the following school year. The Superintendent never responded to the letter. Ms. Nest did not discuss options for Student's placement with the Superintendent.

27.     Concerned about the tenor of the conversations between Student's mother and Ms. Nest and the concern of Student's mother that the IEP meeting would be a charade, Ms. Whitney contacted Ms. Loveman to set up a meeting prior to the scheduled IEP meeting. Ms. Loveman agreed that a meeting would be helpful to try to restore trust and confidence between Student's mother and Ms. Nest. Ms. Loveman hoped that this meeting would make the following day's IEP meeting more productive.

28.     The meeting took place at the District's offices on May 10, 2007, and lasted approximately 30 minutes. Present were Student's mother, Ms. Whitney, Ms. Loveman, Ms. Ryder, and Ms. Nest. Student's mother expressed her concerns about the District following Dr. Schreibman's recommendations and concerns that the District would insist that Student attend the District's SDC the following school year. According to Ms. Whitney, Ms. Nest was defensive about the District's programs and her staff and stated that she wanted to ensure that Student's mother did not criticize the staff or their programs during the IEP meeting the next day. However, Ms. Nest also listened to what Student's mother had to say and did not state that she had been directed by her superiors to refuse to consider anything other than a District placement for Student. Nor did Ms. Ryder or Ms. Loveman express an opinion at this meeting about the benefits or disadvantages of any particular placement for Student. The meeting did not resolve any of discord between Student's mother and Ms. Nest nor did it alleviate any of the concerns Student's mother had that the District had predetermined Student's placement for the upcoming school year.

29.     The IEP team meeting took place as scheduled on May 11, 2007. Present at the meeting were Student's mother, Coyne & Associates ABA supervisor Jessica Korneder, Hanna Fenichel school Director Sarah Hillier, vision specialist Amy Nangel, and Student's attorney Maureen Graves. Also present were Regional Center educational consultant Jane Whitney, District school psychologist Sharon Loveman, Child Development Center Director

12

Suzanne Blackwood,[7] speech and language pathologist Lisa Ryder, behavior specialist Reise, District Director of Pupil Services Mary Ellen Nest, District preschool SDC teacher Tracy Allison and occupational therapist Karen Peterson.  District consultant Dr. Laura Schreibman joined the meeting about an hour after it started.

30.     The team reviewed Student's present levels of performance (the review had begun during the previous meeting on February 16, 2007) and Student's goals.  Student's mother had previously met with Ms. Ryder, the speech and language pathologist, to draft speech and language goals.  The vision specialist had not been able to observe Student prior to this IEP meeting and wanted to do both the observation of Student and specific vision assessments of her, to which Student's mother agreed.  There was no disagreement between the members of the IEP team regarding Student's present levels of performance, the significant progress Student had made during the school year, or what Student's goals for the next year should be.

31.     The IEP team spent a considerable amount of time during the meeting reviewing Coyne's progress report of Student and the observations of Student by Ms. Reise, Ms. Loveman, and Dr. Schreibman.  Hanna Fenichel Director Ms. Hillier reviewed Student's progress at the preschool and the impressions the Hanna Fenichel staff had of Student.  The meeting lasted almost three hours; much the meeting discussion focused on Student's progress, present abilities, and, significantly, what type of placement Student needed in order to make further progress in her education.  Student's mother spoke for very long interludes on what she saw as Student's progress, abilities and needs for the upcoming school year.  Ms. Reise and Ms. Loveman discussed their observations of Student and their concerns that Student was not able to initiate social interactions at school and their concerns that Student's expressive language at school continued to be underdeveloped.

32.     After Dr. Schreibman arrived at the meeting, the team focused on her report and recommendations.  Dr. Schreibman was concerned that Student was still exhibiting perseverating behaviors.  For example, she had observed Student's fixation with one type of play and her lack of spontaneous play with other students.  Dr. Schreibman also expressed her concern, as indicated in her observation report, that Student was not directing language at another person; Dr. Schreibman had observed Student talking to the wall.  Dr. Schreibman believed that these behaviors of Student needed to be extinguished, and believed that a SDC was the best environment for doing so.  She strongly felt that Student should not continue in a fully included classroom.  Rather, Dr. Schreibman believed that Student's appropriate placement was in the District's preschool SDC, although she anticipated that Student would

---

[7]  The Child Development Center (CDC) is a semi-autonomous unit within the District.  It is a self-supporting fee-for-services preschool open to the public.  There is no requirement that a student must be a District resident to attend the CDC.  CDC employees are District employees, although the CDC is funded from student enrollment fees.  The District's general education preschool classes are in the CDC.  The District's preschool SDC classes, however, are operated outside the CDC under direct District control.  Children with special education eligibility whose IEP teams place them in a CDC class do not have to pay the enrollment fees.

soon be able to transition to a general education class if it had a small number of students in it. Dr. Schreibman did indicate, however, that she believed a possible placement for Student could be a combination of the Districts' SDC and the Hanna Fenichel class.

33.    Dr. Schreibman's comments prompted a long discussion between the IEP team members about the benefits and drawbacks of both the District's SDC classroom and the Hanna Fenichel classroom. Unfortunately, at the time of the IEP meeting, no one from the District had been able to observe the four-year-old class at Hanna Fenichel where Student would attend the following school year was she to be placed there. Ms. Hillier discussed the differences between the three-year-old class and the four-year-old class: students attended the latter five days a week rather than two days a week, and the four-year-old class was less play-based and focused more on kindergarten readiness than did the three-year-old class.

34.    There was a marked disagreement between the parties as to the import of the observations of Student by the District observers. Ms. Loveman, Ms. Reise, and Dr. Schreibman believed that the behaviors they observed of Student at school were significant and could best be addressed and extinguished in a SDC setting, although they did see many of the benefits of the Hanna Fenichel classroom. Ms. Reise specifically discussed the benefits of combining a structured classroom during the first portion of Student's day with an inclusive classroom for the second half of her day. Conversely, Student's mother, her attorney, the Coyne representative, Ms. Whitney, and the Hanna Fenichel Director, all believed that Student had demonstrated significant progress during the year. They believed that Student's interactions with peers was increasing, that she was requiring less prompting from her aides, that her language abilities were increasing, and that she was functioning well in the general education inclusive environment at Hanna Fenichel.

35.    Dr. Schreibman had to leave the IEP meeting before it concluded. After she left, the team members spent the majority of the remaining meeting time reviewing and constructing Student's goals and objectives. The IEP team agreed on Student's goals. However, the IEP team did not reach any decision regarding Student's educational placement for the next year and did not spend more than incidental time discussing Student's need for continued ABA therapy. The District did not make an offer of placement and services at the meeting. Rather, the team agreed that the District would submit a written offer of placement and services for Student to her parents after the meeting, based upon the agreed-upon goals and objectives, rather than meeting in person later.

36.    Based upon advice of legal counsel, the District decided to hold another formal IEP team meeting to present its offer of placement and services to Student's mother rather than to submit the offer by mail. The meeting took place on June 13, 2007. Present were Student's mother and her attorney Ms. Graves, Dr. Len Levin (the Coyne Clinical Director), Jessica Korneder from Coyne, Ms. Whitney, Ms. Loveman, Ms. Blackwood, Ms. Ryder, Ms. Allison, Ms. Nest, and Jonathan Read, attorney for the District. No one from the team invited Dr. Schreibman to the meeting.

37.    After discussion of the need to complete Student's vision assessment, Ms. Nest reviewed the IEP notes from the previous meeting. The team then reviewed the special factors page of the IEP document, and reviewed the accommodations and supports that Student required in a classroom in order to access her education. The team then discussed Dr. Schreibman's recommendations for a more structured classroom placement, such as the District's SDC in comparison to the recommendations made by the Coyne representatives. Student's mother pointed out that there was no dispute between the parties that certain interventions should take place to redirect Student's inappropriate behaviors. Rather, the dispute concerned in what type of setting those interventions should occur.

38.    The District then made its offer of placement and services, which Ms. Nest presented. The District made its offer based upon the input of Dr. Schreibman, the observations of Ms. Loveman and Ms. Reise, Coyne's progress report, and input from Student's mother and educational consultant. Based upon all discussion and review of all the reports, the District offered a placement to Student. The offer consisted of placement of Student for two hours in the morning in the District's SDC on its preschool campus for four days a week. Student would then transition to a District general education preschool class, where she would spend two hours a day, four days a week, accompanied by a one-on-one aide. The District also offered to provide Student with one-on-one ABA therapy at the District school site for two hours a day, five days a week. The District also offered Student two 45- minute sessions a week of speech and language therapy, one 60-minute session of group social skills a week, and one 60-minute occupational therapy consultation per month. The District noted that the SDC was actually composed of approximately seven special needs children and five typically developing children so that Student would be educated with typical peers for most of her day.

39.    The District's offer differed from the offer made to Student the previous year in a number of ways. Foremost, it divided Student's time in a classroom equally between a SDC and a general education class. It provided for a one-on-one aide to accompany Student in the general education class. The offer also included a group social skills class that the District had not offered the previous year. The District's offer took into consideration the recommendation of its consultant, Dr. Schreibman, and staff members Ms. Loveman and Ms. Reise, that Student required the structure of a SDC for at least part of her day. It also took into consideration the recommendations of Student's mother, the Coyne representatives, and Ms. Whitney, that Student was ready for inclusion in a general education setting. The offer did not consist of a full placement of Student in an SDC; rather, the District based its offer upon consideration of all recommendations concerning Student. District staff sincerely believed that they considered all input and considered all of Student's needs, and believed that District classrooms could meet those needs.[8]

_____

[8] The District's offer of speech and language services, occupational therapy consultation, and group social skills session, is not at issue.

40.     Although Ms. Nest's comments during her conversations with Student's mother apparently contributed to the tension between the parties, the weight of the evidence does not support Student's contention that the District predetermined Student's educational placement. Ms. Nest may have had her own idea of what was appropriate for Student, as each team member, including Student's mother, may have had. However, there is no evidence that Ms. Nest's superiors directed her to offer a specific placement or to refuse to consider Hanna Fenichel.[9] Nor does the weight of the evidence support an inference that Ms. Nest pressured her staff to make a specific recommendation or to refuse to consider any placement, including one at Hanna Fenichel. The team spent considerable time at the IEP meetings reviewing all recommendations, hearing everyone's comments, considering the benefits and drawbacks of each type of placement, and discussing Student's needs. The District made its offer based upon all these consideration, not on a preconceived notion of what Student needed.

41.     Especially credible was the testimony of school psychologist Ms. Loveman. By the time she testified at the hearing, Ms. Loveman had retired. Therefore, any bias or loyalties that may be argued to influence staff members presently employed by the District could not be attributed to Ms. Loveman. Additionally, and significantly, Ms. Loveman had, and has, a long-term personal relationship with Student's family, extending to when Student's mother was a small child. Ms. Loveman therefore had no reason to temper, color, or change her recommendations to please the District at the IEP meetings or any reason to color her testimony at hearing. If anything, her long-term personal relationship with Student's family would argue for an inference that Ms. Loveman would be more apt to want to skew her recommendations toward the desires of Student's family.

42.     Ms. Loveman, however, gave credible testimony that her recommendation that Student required a SDC placement for at least a portion of her school day, was based upon her observations of Student as corroborated by the observations of Ms. Reise and Dr. Schreibman. Ms. Loveman specifically stated that the District's offer was not predetermined. The weight of the evidence supports this contention with regard to the District's offer of educational placement for Student.

43.     Neither does the evidence support Student's contention that the District failed to consider input from Student's mother, from Coyne, or from any other source, before it made its offer of placement. The fact that Ms. Nest met with different staff members to discuss their observations and a possible recommendation for Student does not lead to the conclusion that the District as a whole had predetermined what the placement should be. First, not all District IEP team members attended the meetings. Second, the purpose of the meetings was to discuss the different observations staff made of Student in preparation for

---

[9] As previously stated, Hanna Fenichel is not a certified NPS. However, there was no mention by the District at any of the IEP meetings or testimony by District staff at the hearing that the lack of NPS status was the reason the District did not offer to place Student there.

the IEP meeting. Third, the evidence indicates that District team members did not all initially have the same recommendation for placement and that a District did not develop a consensus concerning placement for Student until after the IEP meeting held May 11, 2007. The fact that the District did not agree with Student's request for placement at Hanna Fenichel merely reflected that the parties had a good faith disagreement regarding the appropriate placement, not that the District predetermined Student's proposed placement and was not willing to consider her mother's request.

    44.    The weight of the evidence substantiates the District's position that Student's mother, educational advocate, preschool Director, and ABA providers were able to participate meaningfully in the IEP process. The District team members fully considered all comments and recommendations at all IEP meetings these individuals attended. They all asked questions, gave their opinions, voiced their concerns, and gave general input to their belief that Student did not belong in a SDC placement. There is no credible evidence, other than the fact that the District ultimately offered a placement at one of its own schools, that the District prevented Student or her representatives from meaningfully participating in the IEP process.

    45.    Furthermore, the weight of the evidence does not support the inference that the decision to offer a District placement rather than a placement at Hanna Fenichel, or any other private school, was the result of a District-wide policy against private placements. Likewise, Student offered no evidence that any District administrator or policy-maker higher up the school hierarchy than the District IEP team members was dictating placement decisions for special education students or for Student in particular. Nor did Student present any evidence that cost factors were the driving force behind the placement offer made by the District. In sum, the only tangible evidence that Student presents to support her predetermination claim is the fact that the District offered Student a placement at a District elementary school rather than at Hanna Fenichel. However, the fact that the District ultimately believed that its program offered a FAPE to Student and that, therefore, it need not offer Student a placement at a private preschool does not compel the conclusion that the offer was predetermined.

    46.    Student has failed to produce persuasive evidence that the District predetermined her educational placement prior to the June 13, 2007 IEP team meeting. No procedural violation occurred.

    47.    The analysis concerning the District's offer to Student of ABA therapy for 10 hours a week at the District school site, results in the same conclusion concerning whether that portion of the District's offer was predetermined. A review of the record of the IEP team meetings[10] indicates that there was meaningful discussion of Student's need for intensive one-on-one ABA therapy and discussion between the parties as to where the therapy should occur. The parties specifically discussed the recommendations made by

---

[10]  The ALJ listened to the full recording of both meetings.

Coyne. Student's mother stated that Coyne recommended that Student continue to receive a total of 30 hours a week of ABA services.[11] She clarified that the ABA services at home would significantly decrease the following school year while there would be a corresponding increase in school ABA services since the time an ABA aide would accompany Student to school would increase.

48.     In response to the concerns raised by Student's attorney and by her mother, District school psychologist Sharon Loveman stated that she felt Student was ready to have her discrete trial training moved from the home to school. There is no evidence that the District attempted to foreclose Student's mother or attorney from voicing their opinions or concerns about what they considered appropriate for Student's ABA therapy and no evidence that discussion was stifled. To the contrary, Student's mother spent considerable time voicing her opinion as to what she thought was proper level and type of services. Although Student's mother also voiced a strong opinion at the IEP meeting that the District had predetermined Student's ABA services, the weight of the evidence does not support this contention. District staff gave reasoned explanations to Student's mother as to why they felf Student's ABA services should be moved from the home to school. There is no compelling evidence that the recommendation to so was based on a District policy against in-home services or that school officials higher up in school hierarchy had instructed either Ms. Nest or other school staff that in-home services should not be considered.

49.     Both Ms. Loveman and Ms. Reise had observed Student at home during ABA therapy sessions. Both noted that Student's language was more expressive and better grammatically at home. Both noted to the IEP team that Student's social skills and responses to her environment were stronger at home than at skill. In addition, both believed that because Student's skills were stronger at home and that because she was not generalizing her skills from home to the school environment, the better course of action was to provide Student's ABA services at school.

50.     The core of the disagreement with regard to the ABA services at the IEP meeting therefore was where the services should be delivered and by whom. The District's offer of 10 hours of one-on-one ABA services corresponded substantially to the 12 hours Student's mother stated that Coyne would be providing based upon Coyne's recommendation. The District listened to the arguments advanced by Coyne, Student's mother, and Student's attorney that ABA services be continued in Student's home. There simply was a disagreement as to whether in-home services were necessary to meet Student's needs. That the District was not persuaded by the arguments advanced by Coyne and Student's mother and attorney does not mean that the District predetermined that it would only offer ABA services at the school site.

51.     The weight of the evidence therefore fails to support Student's contention that the District either predetermined the amount and location of ABA therapy offered to Student

---

[11] Coyne's report actually recommends a total of 25 to 30 hours of total ABA services.

at the June 13, 2007 IEP team meeting and or made the offer without considering the input of Student's mother or the Coyne representatives.  There was thus no procedural violation of Student's right to a FAPE.

*Adequacy of the District's Offer of Placement and ABA Services*

52.      A school district provides a FAPE to a student if it designs its program or placement to address the student's unique educational needs and provides a program and services reasonably calculated to provide some educational benefit to the Student in the least restrictive environment. A school district is also required to provide a student with special needs a program, including support services, designed to address the child's unique needs. If the school district's program met the substantive factors, then it provided a FAPE, even if the student's parents preferred another program and even if his or her parents' preferred program would have resulted in greater educational benefit to the student than the program offered by the district.  The district's program must provide some educational benefit; it need not maximize the student's potential.[12]

*Student's Unique Needs*

53.      The parties do not dispute that Student does not have weaknesses in the area of cognition, where assessments indicate that she is in the normal range of mental development for her age.  Rather, Student's weaknesses are in the areas of socialization and expressive language.  She continues to demonstrate traits typically associated with autism.  She still needs prompting to focus on topics and still needs prompting to interact with other children; Student does not always engage with other children spontaneously in the classroom. Student's expressive and pragmatic language in the classroom is still below normal developmental level although her language is much more expressive when she is conversing in her home.  Student still requires the assistance of a one-on-one aide in the classroom to prompt Student to follow instructions, to redirect her activities or inappropriate behavior, and to assist her in initiating interactions with peers.  Student also continues to show anxiety when she is in large group settings such as restaurants and church Sunday school, requiring family support and assistance to assist her in functioning in these environments.

*Inadequate Offer of Intensive ABA Therapy Services*

54.      Student contends that she requires approximately 17 hours of in-home ABA therapy.  She asserts that the 10 hours per week of school-site ABA therapy offered by the District is insufficient to provide her with meaningful educational benefit.  Student contends

---

[12] Contrast this standard with the applicable standard under California's Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4501 et seq.) which states that "It is the intent of the Legislature that regional centers assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community." (Welf. & Inst. Code, § 4640.7.)

the program should have been offered in her home, which is a more naturalistic setting for a four-year-old child. She also contends that the program offered to her is not scientifically based and supported by peer-reviewed research as required by the reauthorized IDEA. The District contends that Student has not met her burden of proving that the program it offered will not provide at least some educational benefit to her.

55.     The weight of the evidence does not support Student's contentions. First, Student presented no evidence, either documentary or through testimony at hearing, that Student needs some 17 hours a week of one-on-one ABA services. Indeed, Jessica Korneder,[13] the Coyne representative supervising Student's ABA program, indicated at the IEP meetings and at hearing that she believed that Student continued to require a total of 30 hours of ABA therapy. She recommended that the 30 hours be divided between provision of one-on-one aide services at Student's school for the time Student participated in a classroom, and about 12 hours of intensive ABA therapy in Student's home. With regard to the number of ABA hours needed by Student, the District's offer therefore is very close to that recommended by Ms. Korneder. The District's offer includes 10 hours of one-on-one ABA therapy and one hour of a facilitated group social skills session (which Student is not presently receiving) for a total of 11 hours. There is simply no evidence that Student will not be able to access her education or will be unable to progress in the curriculum with one less hour of services that that recommended by Ms. Korneder. While additional hours of ABA certainly might provide additional benefit to Student, the District is not required to maximize her potential.

56.     Additional support for the District's position that its offer of 10 hours of ABA is sufficient to meet Student's unique needs is found in the documentary and testimonial evidence Student provided in support of her contention that she does not require placement in a SDC. As will be discussed in more detail below, Student presented many witnesses whose testimony all corroborate the fact that Student has progressed extraordinarily well in the two years she has been receiving intensive ABA therapy. Her autistic-like behaviors have significantly decreased, and her receptive and expressive language abilities have increased. Student's mother wrote in the IEP notes that Student often uses complete sentences to ask for things, to comment on her surroundings, to sing songs, to communicate with others and to describe how she is feeling. Student's mother also noted that in a year's time, Student had become another person. Her autistic-like behaviors had been extinguished to a good extent, Student interacted with peers in and out of school, and she could now engage in long sessions of imaginative play. Ms. Woodall corroborated the observations of Student's mother, stating at hearing Student had made extreme progress. Dr. Joseph Morrow,[14] one of

---

[13] Ms. Korneder has a Masters degree in Behavior Analysis from Western Michigan University, and is a Board Certified Behavior Analyst. She has been working at Coyne for about two years and is one of its Regional Directors. Ms. Korneder has almost 10 years of experience working in the area of ABA, with increasing responsibility over the years for supervision of ABA programs.

[14] Dr. Morrow obtained a Doctorate degree from Washington State University in experimental psychology. He has spent over forty years working in the area of behavior analysis. He is a professor emeritus at

Student's experts who observed her in her home, stated that he might not be able to identify Student as a child with autism if not told in advance of her diagnosis. These comments about Student do not lead to a conclusion that she requires more than 10 hours of ABA therapy in order to obtain benefit from her education

57.     There is more dispute as to where Student's ABA services should take place. Dr. Bailey, [15] Dr. Levin,[16] Ms. Korneder and Ms. Woodall, all believe that Student's ABA services should occur in the home, which they believe is the natural setting for a child of Student's age. They believe that Student needs to learn at home and then generalize this knowledge to other settings, such as school. Student points to literature showing that autistic students received the most benefit from in-home programs. However, as discussed above, the standard is not where a student will benefit the most from a particular service. Rather, the legal standard is whether a student will obtain educational benefit from what a district is offering. In this case, the evidence supports a finding that Student will obtain educational benefit from an ABA program at a District school site.

58.     Ms. Reise, the District's behavior specialist, and Ms. Loveman, the District's school psychologist, both observed Student in her preschool and in her home. Both observed that Student's language abilities and social interactions were much more in evidence at home than at school. Ms. Loveman noted that Student was much more spontaneous and independent. Because of the discrepancies between Student's demonstrated abilities at home as compared to school, Both Ms. Loveman and Ms. Reise believe, and the evidence substantiates, that Student will benefit from moving her ABA instruction to the school setting. The evidence supports the District's contention that Student will benefit from learning to generalize her abilities to the school setting rather than continuing to concentrate on the home setting where she shows greater competency. This is especially true since the stated goal of Student's mother, her experts, and Coyne is to prepare Student for full-inclusion in a general education Kindergarten for the 2008-2009 school year.

59.     Student also contends that the ABA program offered by the District is not scientifically based or supported by peer-reviewed research. First, the District in its closing brief correctly points to the United States Department of Education's commentary to the new federal regulations implementing the reauthorized IDEA. That commentary states "[T]here

---

California State University, Sacramento, a licensed psychologist, and a Board Certified Behavior Analyst. Dr. Morrow founded, and is presently the president of, Applied Behavior Consultants, a certified NPS for students with autism, which also provides ABA therapy to children and toddlers.

[15] Dr. Bailey received her Doctorate degree in clinical psychology and developmental psychology from the University of Southern California in 2004. She is presently an assistant professor at California State University, Fullerton. She is not a licensed psychologist of Board Certified Behavior Analyst, although she has significant training and education in psychology and learning disabilities.

[16] Dr. Levin, Coyne's Clinical Director, received his Doctorate degree in Clinical Psychology from the State University of New York in 1996. He has a significant amount of experience working with autistic children, and a number of publications to his credit.

is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE. The final decision about the special education and related services, and supplementary aids and services that are to be provided to a child must be made by the child's IEP Team based on the child's individual needs." (71 Fed.Reg. 46665 (August 14, 2006).)

60.     More significantly, there is no evidence that the District proposed using behavioral instruction that differed significantly from that provided by Coyne. District behavior specialist Jodi Reise credibly testified that the behavior program that she supervised was based upon traditional ABA principles, including the integration of discrete trial training, pivotal response training, and intensive one-on-one instruction. As the District points out, Dr. Levin and Ms. Korneder stated the methods used by Coyne were not based solely on traditional discrete trial training principles.

61.     Dr. Schreibman corroborated the use of different methodologies to influence a child's behavior, stating, as did Dr. Levin, that different methods work with different children. Dr. Schreibman, who was a student of Dr. O. Ivar Lovaas[17] at the University of California, Los Angeles, was a knowledgeable and persuasive witness who credibly testified that researchers are constantly exploring new methods of behavioral analysis in order to individualize treatment for autistic children. As Dr. Schreibman explained, interventions for autistic children are upon applied learning theory, commonly referred to as ABA. However, there are several strategies that have been researched and validated, all of which prove beneficial to some children. These strategies include discrete trial training, pivotal response training, incidental teaching, and the picture exchange communication. Dr. Schreibman explained that ABA is a research technology, not a specific treatment. Rather, there are a number of treatments that are included in the umbrella of behavioral intervention.

62.     Dr. Schreibman further explained that research has determined that many children do not respond well to discrete trial training, and that others do not respond to pivotal response training. Therefore, a program must be developed to respond to the child's specific needs. Dr. Schreibman is acquainted with Ms. Reise and believes that she is capable of implementing an appropriate behavioral intervention program for Student.

63.     Student provided significant evidence that the ABA intervention program she receives from Coyne is excellent and that the service providers, in particular Ms. Korneder, are extremely well trained and qualified. Dr. Schreibman agreed that Coyne provides a quality service. Student's evidence also demonstrated that Coyne's program is more structured and better supervised than the District's ABA program, that it keeps better records, and that its supervisor, Ms. Korneder, has stronger educational qualifications and more behavior intervention experience than does Ms. Reise. However, the fact that Student's

---

[17] Dr. Lovaas is the author of the seminal study of behavior analysis in autistic children, "Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children." (Journal of Consulting and Clinical Psychology (1987).)

present program may be better than the one offered by the District does not mean that the District's program will not provide Student with a FAPE. The District need not provide the best program; it only need provide a program that offers more than minimal educational benefit to her. The weight of the evidence demonstrates that the District's intensive one-on-one ABA program will more than meet that standard.

64.     In sum, the weight of the evidence supports the District's contention its offer of 10 hours of intensive one-on-one ABA services provided to Student at the District's school site meets Student's unique needs in the area of behavioral intervention. Student has presented no compelling evidence that she will not receive some educational benefit from the 10-hour program offered by the District. She has not met her burden of proof to show that the ABA program offered by the District is not based on appropriate ABA principles. Student has therefore failed to meet her burden that the District's ABA program denies her a FAPE.

### Special Day Class offered by District

65.     Student contends that the SDC at the District's preschool does not incorporate adequate ABA principles, fails to include peers with compatible instructional needs, and is not the least restrictive environment for Student.

66.     Student's argument that the SDC fails to include peers with compatible instructional needs is not supported by persuasive evidence. District witnesses Mary Ellen Nest, Jodi Reise, and SDC teacher Denise Gomez all testified that the composition of the SDC was approximately seven special needs children and five typically developing children. The class was specifically designed to integrate typically developing children with the special needs children so that the special needs children could model their behavior on the typical children and so that the typical children could learn to appreciate and learn from the special needs children. There was very little evidence presented about the disabilities and instructional levels of the special needs children presently enrolled in the SDC. However, even assuming that they all have a lower cognitive level and more deficits than does Student, the inclusion of the typical peers would balance the composition of the class. Indeed, Dr. Schreibman noted that when she observed the SDC she had difficulty determining which children had identified disabilities and which were typically developing children. Nor has Student demonstrated that Student would not obtain educational benefit from the SDC class merely because her instructional needs are not identical to every child in the SDC class. The weight of the evidence presented by the District is that the SDC teacher teaches to the needs of every student in her class and that, therefore, the SDC class would be able adequately to meet Student's instructional needs.

67.     Student next posits that the instruction in the SDC does not meet her unique needs, as it does not incorporate ABA principles into the structure of the class. Student also questions the abilities of the SDC teacher, Denise Gomez. Ms. Gomez has a bachelor's degree in communications from San Diego State University and an early childhood special education credential from the same school. She is better educated than are most general

23

education preschool teachers. She has had classes in ABA techniques, inclusion training, and course work in autism. Ms. Gomez recognizes that each child is unique, and that some special needs children need more structure and visual cues than do others. Ms. Gomez stressed that the strategies she uses in her classroom as those consistent with traditional behavior intervention methodologies. She focuses on skill acquisition and reduction of inappropriate behaviors. Ms. Gomez is familiar with discrete trial training and knows how to keep data with regard to the discrete trials. Her classroom incorporates ABA methodologies such as discrete trials, behavior management, structuring of the class to meet the needs of the students. The classroom also incorporates sensory integration strategies. Ms. Gomez is willing and capable of implementing Student's goals and objectives in her classroom. The evidence thus demonstrates that Student's concerns about Ms. Gomez's capabilities are unfounded. Further, the weight of the evidence does not support Student's belief that the SDC would not adequately address her educational needs.

68.     Finally, Student asserts that the SDC is not the least restrictive environment (LRE) for her. The IDEA requires, to the maximum extent appropriate, that children with disabilities should be educated with children who are not disabled, unless due to either the nature of the disability, or its severity, education in a regular class cannot be achieved satisfactorily even with the use of supplementary aids and services. Four factors are evaluated and balanced to determine whether a placement is in the LRE: (1) the academic benefits of placement in a general education setting, with any supplementary paraprofessionals and services that might be appropriate; (2) the non-academic benefits of a general education placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students in the general education setting; and (4) the cost of educating the student in a mainstream environment.

69.     Cost factors of educating Student in a general education classroom were not put at issue in this case and thus will not be addressed. Neither is there any evidence that Student would have a negative effect on a general education teacher or the other students in a general education classroom. To the contrary, when the IEP meetings were held in May and June of 2007, Student had spent approximately nine months in a general education classroom without incident. Sharon Hillier, the Director of the Hanna Fenichel school, who observed Student a couple of times a week in Student's preschool class, commented to the IEP team that Student was a delightful addition to the school. Ms. Hillier indicated that Student engaged in class activities and followed classroom routines, albeit with support from Student's aide. Although the observations of Student by District witnesses Dr. Schreibman, Ms. Loveman, and Ms. Reise all noted that Student did not often initiate interaction with her classmates and still had deficits in her language skills, none observed any negative impact by Student on either her teacher or classmates.

70.     Additionally, there is little evidence that Student would not benefit from inclusion in a general education classroom. The observations by Ms. Loveman, Ms. Reise, and Dr. Schreibman did not focus on the benefit Student was receiving in her general education classroom at Hanna Fenichel. Rather, their observations focused on the fact that

Student was not initiating social interaction without prompting. However, upon questioning from Student's counsel at hearing, all agreed that a teacher or an aide in a general education classroom could easily redirect the type of autistic-like behaviors, which the three had observed in Student. All parties, including the District, noted the positive aspects of inclusion, including the fact that typically developing peers would provide excellent roll models for Student with regard to her language and social skills. For these reasons, the District's offer proposed that Student spend half of her classroom time in a general education.

71.     The focus of the inquiry with regard to whether the SDC is the LRE for Student therefore is on factor one:  the academic benefits to Student of a general education class as contrasted with the academic benefits to her of a SDC. In synthesis, the inquiry is whether Student was ready for full inclusion in a general education class when her IEP team met or whether she would have been unable to participate in the academic environment even with support and accommodations.

72.     The District correctly points out in its closing brief that much of the testimonial evidence that Student presented at hearing of her readiness for full inclusion came from witnesses who had not observed Student at the time the IEP team met. Therefore, their observations could not be relevant to whether Student was ready at that time. Dr. Morrow observed Student just days before the hearing, some six months after the IEP team meeting. Dr. Bailey observed Student in late September and early October 2007, four months after the IEP meeting. Dr. Patricia Schneider-Zioga[18] also observed Student mere days before the hearing in this matter. Although their testimony was useful in presenting an overview of Student's present levels of language and social interaction, it was not relevant to what the parties knew, or should have known, when developing Student's IEP six months before the hearing took place. Four to six months is a significant amount of time in the life of any four-year-old child; it is a particularly significant amount of time for Student as the evidence indicated she has consistently made remarkable progress over brief periods.

73.     The District believes, based on the recommendations of its expert, Dr. Schreibman, and staff members Ms. Loveman and Ms. Reise that Student was not ready for full inclusion at the time the IEP team met. The District argues that Student needs to be in an environment where she learns independently to navigate a classroom and where activities are teacher-directed rather than student-directed as preparation for the structure of a typical Kindergarten class. Dr. Schreibman, who is well known in the field of autism, specifically believed that Student required the structure of the SDC class in order to extinguish the behaviors she observed in Student, such as talking without directing her language toward anyone in particular, and not being fully engaged in the classroom. Ms. Loveman and Ms. Reise also believed that Student would be better served in the SDC where the specially-

---

[18] Dr. Schneider-Zioga has a doctorate degree in linguistics from the University of California at Los Angeles. She is presently a full time lecturer at California State University, Fullerton.

trained SDC teacher could focus on extinguishing Student's inappropriate behaviors, increasing Student's language skills, and teaching her navigate a classroom without an aide.

74.     However, the District's arguments in favor of the SDC placement improperly focus on the whether Student's access to her education would be maximized in that setting rather than on focusing on whether Student would be able to progress academically in a general education classroom. The inquiry is not whether the SDC is *best* for Student. Rather, the inquiry is whether Student should be removed the general education environment because the nature and severity of her disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Therefore, even if it is not the best academic setting for a Student, a general education classroom is appropriate if the child can receive a *satisfactory* education there.

75.     The District's contention that the IEP team did not have enough evidence when it met in May and June 2007 to determine that Student could be *satisfactorily* educated in a general education class is not persuasive. Hanna Fenichel Director Sarah Hillier indicated the progress Student had made in her preschool class at the school. Ms. Hillier indicated that Student was participating in the class and following routines. In the nine months Student had been in the class, she had improved significantly in the areas of engagement, play, language and eye contact. Ms. Korneder, and the Coyne progress report, corroborated Ms. Hillier's observations. Coyne noted that Student had achieved many of her IEP goals earlier than projected, had made significant gains in the areas of speech and language, social interaction skills, generalization, and compliance. As of March 2007, Student was beginning to comment to, respond to, and initiate interaction with her classmates. Coyne noted that while Student still required an aide to assist in the acquisition of peer-interaction skills and to support her attending to and compliance with her teacher's directives, for a large part of the school day Student was indistinguishable from her peers. In addition, the weight of the evidence supports Student's contention that she did not need the structure of the SDC classroom in order to obtain benefit from or access her education. The evidence showed that Student does not need tightly controlled activities, adult initiation of all her social activities, or a visual schedule, the core components of the District's SDC, in order to benefit from her education.

76.     Dr. Schreibman, Ms. Loveman and Ms. Reise based their recommendations for a SDC placement on their observations of Student at school. However, the total amount of time spent on those observations was approximately five hours. Conversely, Ms. Hillier and Ms. Korneder observed Student for a few hours a week over nine months. They were able to observe Student's ability to navigate a general education classroom, her ability to learn to follow routines, and her progress in learning to interact with peers. Additionally, the main rationale advanced by the District's observers for placing Student in a SDC was so that her autistic-like behaviors, behaviors that have not been shown to interfere with her access to her education or with the access of other students to their education, could be extinguished. The District offers no legal authority that supports the contention that extinguishing non-interfering behaviors is, or should be, the basis for a child's placement in a SDC. Student has therefore met her burden of proof that she can, at the least, make satisfactory progress in a

26

general education classroom, and has therefore met her burden of proof that a general education classroom is the least restrictive environment for her. The District's offer to Student of placement in a SDC class for a portion of her school day therefore substantively denied her a FAPE.

*General Education Classroom Component of the District's Offer*

77.     Student contends that the general education classroom component of the District's offer denied her a FAPE because it was an inappropriate educational setting for her. She also contends that when the general education component was combined with the early morning SDC placement, the offer required Student to transition through too many areas of the school campus, through too many different activities, and to have to interact with too many different classmates.

78.     All IEP team members agreed that full time placement in a general education class at the CDC would be too overwhelming for Student. Dr. Schreibman specifically stated in her observation report that the CDC classroom, which she believed consisted of 24 children instructed by two teachers, was too much for Student to handle. She recommended that any inclusive classroom for Student, even after she transitioned from the recommended SDC, should only contain a few students. Dr. Schreibman believed that the Hanna Fenichel class, or one with a similar amount of students, would be an appropriate inclusion model for Student.

79.     In fact, the total number of classmates with whom Student would need to interact in the CDC class was actually closer to 30 since a different core group of students attended class on different days. The structure of the CDC class in late morning during the time the District proposed that Student attended it presented an even more complicated picture, particularly for a child who was not scheduled to interact with the class at the beginning of the day when the children participated in opening activities and circle time. During the time Student would be participating in the general education class, the children were divided into two groups of 12, with one group engaging in pre-academic type activities in the classroom and the other group participating in outside activities centering on gross motor skills. The two groups switched after approximately twenty minutes. The children who made up each group changed on a daily basis.[19] After these activities, the 24 children reunited in the classroom for activities such as singing and story time before engaging in closing day activities and transition to lunch and playground time.[20]

---

[19] District witnesses did indicate that they could possibly arrange for the group composition to remain constant; however, the District did not confirm this by memorializing it as a part of the written IEP offer.

[20] In fact, the District's offer would require Student to have to interact with about 42 children each day, counting the children from the SDC and the children in the general education class. This directly contradicts Dr. Schreibman's recommendation that an inclusion class for Student only contain a small amount of classmates because she did not believe Student was ready to handle interacting with a large number of peers at a one time.

80.     Neither District expert Dr. Schreibman, the Coyne representatives, nor Student's family believed that Student was ready to handle a classroom with the number of students in the SDC class. Indeed, the IEP document references the observation of Student's mother that Student still demonstrated anxiety in large groups and that the Student still had difficulty at church and in Sunday school due to the large groups there. While the District staff appeared truly to believe that Student would be able to handle the large group of peers found at the CDC, there does not appear to be any concrete basis for this belief. Ms. Ryder testified that she believed the CDC classroom was appropriate for Student; however, as Student's speech and language provider, Ms. Ryder had only observed Student in a one-on-one setting or interacting with perhaps one other child. Ms. Loveman and Ms. Reise also believed that Student could easily adapt to the large amount of children in the CDC setting, but they had only observed Student at school for a total of 3 hours between the two observations.[21] On the other hand, the belief of the Coyne staff and Student's mother that the CDC class would overwhelm Student is supported by their respective constant contact with Student and observations of her in her present classroom.

81.     Additionally, there appears to be no concrete basis for the District's position that Student was capable of transitioning from the SDC to the CDC, and to make all the transitions required in the CDC class, even with the provision of an aide. In fact, the District's position is contradictory. It first asserts that Student requires a SDC class because she in not engaging enough with her classmates and is dependent on her aide for initiating social interactions. Simultaneously, the District asserts that Student is capable of interacting with some 42 students a day and transitioning not only between multiple activities in a classroom but also transitioning between two groups of students in two very different classes. The District's arguments in support of its position are unpersuasive.[22]

82.     The ALJ finds that the Student has met her burden of proof that the CDC classroom was not an appropriate instructional setting for her and therefore the District's offer substantively denied her a FAPE.

*Failure to Provide Staff Adequately Trained to Implement Student's IEP*

83.     Student's contends that the District staff is not adequately trained. Although not specified in her stated issues for hearing, Student appears to focus her concerns on whether Jodi Reise, the District behavior specialist, is qualified to supervise Student's ABA program and whether Denise Gomez, the SDC teacher, could implement Student's IEP. As discussed above, Student has not met her burden of proof in either regard.

---

[21] Although a long time family friend, there is no evidence that Ms. Loveman had observed Student outside the context of her formal observations in preparation for the IEP meetings.

[22] CDC Director Suzanne Blackwood and CDC teacher Jody Gallagher discussed the general education program and classrooms at the CDC. Their accounts credibly support the District's position that the District offers a quality preschool education. This Decision just finds that the program did not meet the needs of the student in this case.

84.     Denise Gomez has a bachelor's degree, a certificate in early childhood special education, and experience, albeit not extensive, teaching special needs preschool children. She also has the support of aides in her classroom as well as qualified special education District staff should she need to consult about Student or the implementation of Student's IEP. Although not a Board Certified Behavior Analyst (BCBA), Ms. Reise has extensive experience with autistic children both as a credentialed special education teacher and as a supervisor at a NPA, which offers ABA services similar to those of Coyne. As the District points out in its closing brief, there is no legal or ethical requirement that a BCBA supervise an ABA program; Dr. Morrow indicated that his NPA often hires supervisors who are not Board certified. Student has therefore failed to meet her burden that District staff is not qualified to supervise her ABA program or that District staff could not implement Student's IEP.

*Appropriateness of the District's Assessments and Reimbursement of Student's IEE*

85.     A parent has the right to obtain an IEE if the parent disagrees with a district's assessment. When a parent makes a request for an IEE, a district must either fund the IEE at public expense or file for a due process hearing to show that its assessments were appropriate. Individuals who are knowledgeable about a student's disability and competent to perform the assessments must conduct assessments. The tests and assessment materials must be validated for the specific purpose for which they are used, and must be selected and administered so as not to be racially, culturally or sexually discriminatory. The assessments must be provided and administered in the student's primary language or other mode of communication unless this is clearly not feasible. The assessors must use a variety of assessment tools including information provided by the parent. Reassessment of a child may occur if a district believes that the child's needs warrant reassessment or if the child's parents or teacher requests reassessment. Unless other requested, reassessment shall not occur more than once a year, but must occur at least every three years. As part of any reassessment, the IEP team and other appropriate professionals are required to review existing assessment data or observation data for the student and receive input from the student's parents to establish if the team needs further information to determine the student's continued eligibility for special education services and what his or her present needs are.

86.     The District administered a multidisciplinary initial assessment to Student in the spring of 2006, in preparation for her initial IEP. The assessment included an evaluation of Student's health and development. The District also administered a transdisciplinary play-based assessment that included clinical observations, administration of the Southern California Ordinal Scales of Development – Cognition, administration of the Behavior Assessment System for Children, record review, and the MacArthur Communicative Development Inventories.

87.     Student's IEP team met on February 16, 2007, in order to start the process of formulating her IEP for the 2007-2008 school year. As part of that process, the team discussed what reassessments and new assessments Student needed. The team determined that a formal, standardized assessment was not necessary in order to determine Student's

29

present academic achievement. Instead, the IEP determined that Student's SDC teacher and a District behavior specialist would determine Student's academic achievement through observations of her and a review of her records. Likewise, the team determined that a formal, standardized assessment in the area of cognitive functioning was not necessary. Rather, the team designated the school psychologist to observe Student and review her records to determine Student's needs in this area. The team also agreed that the District would contract with an outside evaluator who would also conduct an observation of Student and report on her findings. The consultant and District staff members were also going to observe Student's social adaptive behavior. The team ultimately determined that a more formal speech and language assessment was needed for Student as was more formal vision testing. These latter formal assessments were eventually completed. They are not at issue in this hearing.

88.     As discussed above, school psychologist Ms. Loveman, behavior specialist Ms. Reise, and outside consultant Dr. Schreibman, conducted observations of Student in March and April 2007. Student's parents disputed the observations of each, and the ultimate placement recommendations of each, as did the Director of Student's preschool and her ABA providers from Coyne. Student's parents therefore did not agree to the District's offer of placement and services at the IEP team meetings held May 11 and June 13, 2007.

89.     On April 7, 2007, Student's parents wrote to Ms. Nest, informing her that they would be unilaterally placing Student at Hanna Fenichel for the 2007-2008 school year. They also informed Ms. Nest that they were going to obtain IEEs for Student because they specifically disagreed with the recommendations of the District's outside consultant (Dr. Schreibman) that Student required placement in an SDC. Student's parents informed Ms. Nest that they would be seeking reimbursement from the District of the IEEs, indicating that they were considering IEEs by an educational psychologist, a speech and language pathologist, an ABA expert, and an expert on educational inclusion for students with autism. Student's attorney confirmed to the District's attorney that Student was seeking an IEE at public expense. Rather than agreeing to pay for the IEEs, the District exercised its rights and filed its own due process complaint to validate its assessments.

90.     Student's parents never obtained a speech and language IEE. There was no evidence presented at hearing and no argument made in Student's closing briefs that the speech and language assessment conducted by speech and language pathologist Lisa Ryder over eight days in March and April 2007 did not meet legal standards or was in any way improperly administered.

91.     The only "assessment" ultimately obtained by Student's parents was from Dr. Caroline Bailey. As stated above, although she has a Doctorate degree in psychology, Dr. Bailey is not a licensed psychologist. She is not licensed to administer standardized tests to adults or children, and she did not do so with Student. Rather, Dr. Bailey spent numerous hours observing Student in Student's home, school, and church, numerous hours reviewing Student's records and researching issues concerning Student's autism, and numerous hours

preparing her extensive report concerning her findings and recommendations of Student. Dr. Bailey's bill, and the reimbursement request by Student's parents, is for $24,900.

92.     Student maintains that her parents are entitled to reimbursement for Dr. Bailey's services because the District's observations did not comply with evaluation and reporting requirement and because Student disagrees with the observations and recommendations of Dr. Schreibman that Student engages in autistic-like behaviors to such an extent that an SDC placement is necessary.

93.     Student's request for reimbursement fails on several grounds. First, while she argues that the District's "assessment" failed to comply with evaluation and reporting requirements, Student fails to identify what those standards are and in what way they were violated by the District. As the District points out in its brief, while there are specific legal standards for formal assessments, there simply are no statutory or regulatory standards for observations of students. That Student disagreed with what Dr. Schreibman observed and recommended does not result in finding that she is entitled to an IEE. Nor does the fact that Dr. Bailey conducted a much more intensive observation and spent many more hours on her observation and review of Student than did Dr. Schreibman result in the invalidation of Dr. Schreibman's observation and recommendation.

94.     Second, if Student believed that formal assessment, with standardized testing, was warranted for her, she should have made such a request. She did not. Nor did Student's parents obtain an IEE that met the legal standard of being administered by someone competent to perform the assessment, since Dr. Bailey is not licensed to administer standardized tests and did not, in fact, administer any. She, like Dr. Schreibman, only observed Student. Student fails to demonstrate in what way Dr. Bailey's observations, review, and research, meet evaluation and reporting requirements not met by Dr. Schreibman.

95.     Finally, there is no requirement that reassessment of a student within three years of formal assessing must include formal, standardized testing unless it has been requested by either the student's parents or teacher. Student did not request any formal assessments and did not obtain any IEE that met the legal standards indicated in paragraph 85 above. The evidence thus supports the District's contention that its observations of Student were appropriate, that there is no specific standard by which to measure observations, and that Student's IEE met a standard that the District's observations did not meet. Student is therefore not entitled to reimbursement for the costs of Dr. Bailey's services.

*Appropriate Remedies*

96.     A school district may be required to reimburse a parent for the costs of private school tuition and other related services if the district failed to make a FAPE available to the child. Reimbursement is an equitable remedy that is determined on the facts of each case. As determined in Factual Findings 76 and 82, the District failed to offer Student a FAPE for

31

the 2007-2008 school year by not offering her a placement in the least restrictive environment, and by offering her a placement in the District's CDC general education class which failed to meet Student's unique needs.

97.     Reimbursement for the cost of a private school may be reduced or denied if the parents did not provide notice, prior to removing the child from the public school, that rejects the proposed placement, states their concerns, and expresses the intent to enroll the student in a private school. As determined in Factual Finding 89, Student's parents provided the District the required notice prior to unilaterally placing her at Hanna Fenichel.

98.     There is no statutory prohibition against an ALJ ordering reimbursement of a student's expenses incurred at either a private school or a private service agency that has not been certified by the State of California. However, California law specifically prohibits an ALJ from rendering a decision whose result is the placement of a special needs student in a nonpublic school or a nonpublic agency that has not been certified by the State of California. While the parties do not dispute that Coyne is a certified NPA, Student admits that Hanna Fenichel is not a certified NPS.

99.     Finally, equitable considerations, such as the conduct of both parties, may be evaluated when determining what, if any, relief is appropriate. Several factors may be considered when determining the amount of reimbursement to be ordered: the effort parents expended in securing alternative placements; the availability of other more suitable placements; and the cooperative or uncooperative position of the school district or of the student's parents.

100.    The weight of the evidence is that Hanna Fenichel was an appropriate placement for Student. All parties, including the District's expert consultant, gave glowing reviews of its staff and program as well as the excellent progress Student has made while attending that school. Nor does the District point to any equitable reasons to deny reimbursement to Student's parents of the tuition they have paid for Student's schooling at Hanna Fenichel. Nor is there any evidence of any other suitable placements for Student. The ALJ has found that the District's offer of placement denied Student a FAPE as its SDC did not constitute the LRE for Student and its CDC general education class was not appropriate for her. Therefore, Student is entitled to reimbursement of her tuition for the past school semester at Hannah Fenichel.

101.    Student also requests prospective reimbursement for costs at Hanna Fenichel for the remainder of the 2007-2008 school year. The ALJ is prohibited by statute from ordering prospective placement at the school since it is not a certified NPS. If the issue were simply that Student's parents had prepaid the full year's tuition at Hanna Fenichel, but were not required to do so, Student's argument that her parents are entitled to full payment of the tuition as reimbursement rather than a prospective cost, would be unpersuasive. However, the quirk in this case is that Student's mother testified, and the Hanna Fenichel Director confirmed, that the school requires parents to pay the full year's tuition in advance in order to preserve a place in the school. The District provided no evidence to counter this assertion.

The ALJ finds that Hanna Fenichel is an appropriate placement for Student and that there is no evidence in the record of any other placement that would be suitable for her. The ALJ also finds that there is no evidence that Student's parents did not adequately cooperate with the District during the IEP process and that the evidence supports the assertion of Student's parents that they were required to prepay a full year's tuition. Therefore, the ALJ finds Student's parents are entitled to reimbursement of the full year's tuition at Hanna Fenichel, for $6,100.

102.    Student further requests that the ALJ order retroactive and prospective payment of the costs of the Coyne one-on-one ABA aide that Student needs in order to attend the general education classroom at Hanna Fenichel. There is no dispute that Student requires such an aide in a general education classroom. Coyne is a certified NPA so there is nothing to prohibit the requested order by the ALJ. However, Student has failed to demonstrate that the District could not provide an adequate aide to address her needs at Hanna Fenichel. Nor is Student entitled to select her own provider of services. Acknowledging that Student requires an aide, the ALJ shall therefore order that the District provide an appropriate aide to Student in her class at Hanna Fenichel. The aide shall have been specifically trained in ABA principles and specifically trained to work with autistic children. Should the District decided to use an aide other than one from Coyne, the District will arrange for an IEP team meeting to determine an appropriate plan to transition Student from her Coyne aides to the aide(s) selected by the District.[23]

103.    Finally, Student's mother requests that she receive reimbursement for the hours she spent providing one-on-one ABA therapy to Student, which supplemented the hours provided by Coyne beginning in September 2007. The evidence fully supports the contention of Student's mother that she is qualified to provide ABA services to Student, or to any child in need of such services. After Student was diagnosed with autism, her mother began researching treatments and theories concerning autism. Student's mother later obtained a graduate certificate in ABA from Pennsylvania State University that qualifies her to provide ABA services. She has gone to extraordinary efforts to become knowledgeable about autism and, in particular, about her daughter's specific needs. Student's mother has also invested considerable time and effort in obtaining training so that she can address her daughter's needs. However, there is no support for Student's position that a parent is entitled to payment for providing educational services to his or her child under the facts of this case. Additionally, since the ALJ has found that the District's offer of 10 hours a week of ABA services would provide educational benefit to Student, there is no evidence to support Student's contention that she required the additional hours of ABA services provided to her by her mother in order for her to receive a FAPE. Finally, the ALJ notes that implementation of ABA concepts in an autistic child's home after the child's parents have received training, appears to be one of the foundations of ABA therapy. Indeed, Dr. Morrow testified that the

---

[23] In any case, Student has not presented evidence of what the cost of the Coyne one-on-one aide is or if Student's parents have paid any or all of the past costs of that services.

one of the key components of the ABA program his NPA had begun with toddlers is the concept that the children's parents would receive training so that they could continue the ABA therapy the child received in Dr. Morrow's clinic in the home. Student therefore has failed to meet her burden of proof that her mother is entitled to payment for the hours she has spent supplementing Student's ABA therapy.

## CONCLUSIONS OF LAW

*Burden of Proof*

      1.    Student, as the petitioning party seeking relief in issues A(1) through A(6), has the burden of proof as to those issues. The District, petitioning party in issue B, has the burden of proof as to that issue. (*Schaeffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

*Did the District predetermine its offer of placement and related services in its IEP offer for the 2007-2008 school year?*

      2.    Pursuant to the Individuals with Disabilities in Education Improvement Act (IDEIA), effective July 1, 2005, and California special education law, children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (Ed. Code, § 56000.) FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school education in the state involved, and conform to the child's IEP. (20 U.S.C. § 1402(9).)

      3.    There are two parts to the legal analysis of whether a school district complied with the IDEA. The first examines whether the district has complied with the procedures set forth in the IDEA. The second examines whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefit. (*Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley* (1982) 458 U.S. 176 [102 S.Ct. 3034, 73 L.Ed.2d 690] (hereafter *Rowley*).)

      4.    The IDEA requires that a due process decision be based upon substantive grounds when determining whether the child received a FAPE. (Ed. Code, § 56505, subd. (f)(1).) A procedural violation therefore only requires a remedy where the procedural violation impeded the child's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision making process regarding the provision of a FAPE to the parent's child, or caused a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E); Ed. Code, § 56505, subd. (j); *Rowley, supra*, 458 U.S. at pp. 206-07; see also *Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F.3d 877, 892.) Procedural violations which do not result in a loss of educational opportunity or which do not constitute a serious infringement of parents' opportunity to participate in the IEP formulation process are insufficient to support a finding that a pupil has been denied a free and appropriate public

education. (*W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1483 (hereafter *Target Range*).)  Procedural errors during the IEP process are subject to a harmless error analysis. (*M.L., et al., v. Federal Way Sch. Dist.* (9th Cir. 2004) 394 F.3d 634.)

5.      In determining the educational placement of a disabled student, the public agency must ensure that the placement is based on the child's IEP.  (34 C.F.R. § 300.116.) Predetermination of a student's placement is a procedural violation that deprives a student of a FAPE in those instances where placement is determined without parental involvement in developing the IEP.  (*Deal v. Hamilton County Bd. of Educ.* (6th Cir. 2004) 392 F.3d 840 (hereafter *Deal*); *Bd. of Educ. of Township High School Dist. No. 211 v. Lindsey Ross* (7th Cir. 2007) 486 F.3d 267.)  However, merely pre-writing proposed goals and objectives does not constitute predetermination; nor does providing a written offer to a Student before her parents have agreed to it.  (*Doyle v. Arlington County Sch. Bd.* (E.D. Va. 1992) 806 F.Supp.1253, 1262.)  Indeed, a district has an obligation to make a formal written offer in the IEP that clearly identifies the proposed program.  (*Union Sch. Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526.)

6.      A school district has the right to select a program and/or service provider for a special education student, as long as the program and/or provider is able to meet the student's needs; IDEA does not empower parents to make unilateral decisions about programs funded by the public.  (See, *N.R. v. San Ramon Valley Unified Sch. Dist.* (N.D.Cal. 2007) 2007 U.S. Dist. Lexis 9135; *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580* (D. Minn. 2003) 259 F. Supp.2d 880, 885; *O'Dell v. Special Sch. Dist.* (E.D. Mo. 2007) 47 IDELR 216.)  Nor must an IEP conform to a parent's wishes in order to be sufficient or appropriate.  (*Shaw v. Dist. of Colombia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA does not provide for an "education…designed according to the parent's desires."], citing *Rowley, supra*, 458 U.S. at p. 207.)

7.      In the instant case, the weight of the evidence fails to prove that the District predetermined its offer of placement and services for Student at its preschool SDC and preschool general education class.  Although Ms. Nest expressed concerns to Student's mother prior to the IEP meeting on May 11, 2007, that the parties would not be able to reach agreement at the meeting, those concerns do not compel a finding that the District's IEP team as a whole had made a decision regarding where it would offer to place Student.  Although Ms. Nest discussed the upcoming IEP team meeting with other District staff members, she did so only to obtain an understanding of what each had observed of Student and what each might be recommending as a placement.

8.      There is also no evidence that Ms. Nest either directed District IEP team members to refuse to consider a particular placement or that she attempted to influence their recommendations in any way.  Unlike the circumstances in the *Deal* case, the Student presented no compelling evidence that the District here had a policy of refusing to place special education students at private schools or give students in-home ABA services if such was necessary and appropriate.  Nor has Student proven that high-level District officials were

35

dictating placement decisions concerning special education students. Unlike the school district in *Deal*, the District here provided many opportunities for the Director of the private school (Hanna Fenichel) and the private ABA provider (Coyne) to offer their opinions and recommendations. Contrary to the circumstances in *Deal*, District IEP team members not only permitted, but also encouraged, Student's mother and her educational consultant, as well as her attorney, private school Director, and provide ABA providers, to contribute to the discussions concerning placement and services. There was no evidence of District attempts to stifle discussion concerning placement at Hanna Fenichel. To the contrary, a review of the IEP meetings indicates that many different IEP members and consultants dedicated considerable portions of the IEP meetings on May 11, 2007, and June 12, 2007, to discussing the conflicting recommendations for Student's placement and services. Furthermore, there is no evidence that the District made statements either at or outside of IEP meetings that it would never consider a private school placement for Student.

      9.     Pursuant to Factual Findings 12 through 46, and Conclusions of Law 2 through 8, the evidence fails to support the Student's position that the District predetermined its offer of placement and services for Student. To the contrary, the evidence supports a conclusion that the District encouraged discussion of a placement at Hanna Fenichel as compared to a placement in its classrooms. None of the cases cited above or cited by Student in her closing briefs stand for the proposition that a district is required to offer a placement that is suggested by a student, or that the failure to accept a student's suggested placement means, *ipso facto*, that a district has predetermined placement. Student has therefore failed to meet her burden of persuasion that the District's offer of placement in its SDC and in its general education class, was predetermined before the IEP meetings and has thus failed to prove that the District procedurally violated her rights under the IDEA with regard to her classroom placement.

*Did the District fail to consider all relevant data concerning Student, including input from her parents, before making an offer of placement and related services?*

      10.    In order to fulfill the goal of parental participation in the IEP process, the school district is required to conduct, not just an IEP meeting, but also a meaningful IEP meeting. (*Target Range, supra*, 960 F.2d at p. 1485.) A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools.* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].) "A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." (*Ms. S. ex rel G. v. Vashon Island School District* (9th Cir. 2003) 337 F.3d 1115, 1131.) The test is whether the school district comes to the IEP meeting with an open mind and several options, and discusses and considers the parents' placement recommendations and/or

concerns before the IEP team makes a final recommendation. (*Doyle v. Arlington County School Board, supra,* 806 F.Supp. at p. 1262; *Deal, supra,* 392 F.3d at p. 857.)

11.     Based upon Factual Findings 12 through 46 and Conclusions of Law 2 through 10, Student has failed to demonstrate that the District failed to consider the input, opinions, recommendations, or concerns of Student's mother, Student's ABA providers, Student's preschool Director, or any other individual having information concerning Student, with regard to her placement or services. A review of the IEP team meetings held on May 11 and June 13, 2007, support a finding that there was significant discussion by all attendees concerning the benefits and drawbacks of different placements for Student. Student's mother and ABA providers gave long and detailed descriptions of their views of Student's capabilities as well as what they considered appropriate programs and services for her. There is no indication that the IEP meeting was a charade or that the District was merely going through the motions in holding it. Student has therefore failed to meet her burden of persuasive that the District procedurally violated her rights by failing to consider the input of Student's mother or her service providers.

*Did the District fail to offer an ABA therapy program that meets Student's unique needs because it is not scientifically based and supported by peer-reviewed research, to the extent practicable, is not offered in a home environment, and fails to provide a sufficient amount of therapy hours?*

12.     As stated above, in the *Rowley* case the United States Supreme Court addressed the level of instruction and services that must be provided to a student with disabilities to satisfy the substantive requirements of the IDEA. (*Rowley,* 458 U.S at p. 200.) The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services to maximize a student's abilities. (*Id.* at pp. 198-200.) The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the student. (*Id.* at p. 201.) As long as a school district provides a FAPE, the type of methodology employed in providing a FAPE is left to the district's discretion. (*Id.* at p. 208.)

13.     To determine whether a district offered a student a FAPE, the analysis must focus on the adequacy of the district's proposed program. (*Gregory K. v. Longview Sch. Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314 (hereafter *Gregory K.*).) If the district's program was designed to address the student's unique educational needs, was reasonably calculated to provide him some educational benefit, and comported with his IEP, then that district provided a FAPE, even if the student's parents preferred another program which would have resulted in greater educational benefit. (20 U.S.C. § 1412(a)(5)(A); Ed. Code, § 56031.)

14.     California's definition of special education includes both specially designed instruction to meet the unique needs of individuals with exceptional needs and related

services to enable them to benefit from such specially designed instruction. (Ed. Code, §
56031). Related services may be referred to as designated instruction and services (DIS).
(Ed. Code, § 56363, subd. (a).)

15.     Title 34 Code of Federal Regulations, part 300.320(a)(4) states IEPs shall
include a statement of the special education and related services and supplementary aids and
services, *based on peer-reviewed research to the extent practicable.* The language "to the
extent practicable" regarding the use of peer-reviewed research does not forbid a district
from using an educational program or service that is not peer-reviewed, where it is
impracticable to provide such a program. The United States Department of Education's
comments and discussions regarding "peer-reviewed research" state that "We decline to
require all IEP Team meetings to include a focused discussion on research-based methods or
require public agencies to provide prior written notice when an IEP Team refuses to provide
documentation of research-based methods, as we believe such requirements are unnecessary
and would be overly burdensome." (71 Fed.Reg. 46663 (August 14, 2006).)   The language
"to the extent practicable" regarding the use of peer-reviewed research does not forbid a
district from using an educational program or service that is not peer-reviewed, where it is
impracticable to provide such a program. Courts have determined that the most important
issue is whether the proposed instructional method meets the student's needs and whether the
student may make adequate educational progress. (*Deal v. Hamilton County Dept. of Educ.*
(E.D.Tenn. 2006) 2006 U.S. Dist. LEXIS 27570, pp. 51-57; *Rocklin Unified School District*
(OAH, May 25, 2007) 48 IDELR 234, 107 LRP 31811; 20 U.S.C. § 1414(d)(1)(IV); 34
C.F.R. § 300.320; Ed. Code, § 56345, subd. (a)(4).)

16.     As stated in Factual Finding 53, all parties agree that Student continues to have
unique needs in the areas of expressive and pragmatic speech and language and in
socialization. Nor do the parties dispute that Student continues to require intensive ABA
services to assist in addressing her deficits. Student argues that she requires some 17 hours
of ABA therapy and that the therapy must be provided in her home. As stated in Factual
Findings 54 through 64, and based upon Conclusions of Law 12 through 15, Student has
failed to meet her burden that she requires 17 hours of in-home ABA services in order for her
to obtain benefit from her education. Student did not present compelling evidence in support
of this contention. In fact, Coyne & Associates, Student's present ABA provider, only
recommended in its progress report prepared in May 2007, that Student receive a total of 25
to 30 hours of combined ABA services. Since Coyne provides an ABA aide to Student at her
preschool for approximately 18 hours a week, its recommendation for one-on-one intensive
ABA therapy amounted to only 7 to 12 hours a week. This conforms to the District's offer
of 10 hours a week. Nor did Student provide persuasive evidence that her special needs
dictate that she receive the ABA therapy in home as opposed to at school, in order for her to
obtain educational benefit or to access her education. Student's deficits in language and
socialization are much more marked at home than at school; the evidence thus supports the
District's position that providing the ABA services at school will assist Student in learning to
generalize her newly acquired abilities to the school setting. Finally, as stated in Factual
Findings 59 through 64, and Conclusions of Law 15, Student has failed to meet her burden of
proof that the District's ABA program is not based upon methodologies that are scientifically

based and supported by peer review. To the contrary, the evidence indicated that the ABA program provided by the District includes the same methodologies used by Coyne. The fact that the Coyne providers are more highly trained, are better at record keeping, and may be better supervised than District staff does not support a conclusion that the District's program does not meet legal standards. The District's offer of 10 hours of ABA therapy to be provided at the District's school site therefore did not deny Student a FAPE.

*Did the District's offer of placement for a portion of Student's school day in a special day class deny her a FAPE because it does not incorporate adequate ABA principles, fails to include peers with compatible instructional needs, and is not the least restrictive environment for Student?*

17.    To determine whether a school district substantively offered FAPE to a student, the adequacy of the school district's proposed program must be determined. (*Gregory K., supra,* 811 F. 2d at p. 1314.) Under *Rowley* and state and federal statutes, the standard for determining whether a district's provision of services substantively and procedurally provided a FAPE involves four factors: (1) the services must be designed to meet the student's unique needs; (2) the services must be reasonably designed to provide some educational benefit; (3) the services must conform to the IEP as written; and, (4) the program offered must be designed to provide the student with the foregoing in the least restrictive environment.

18.    Both federal and state law requires school districts to provide a program in the LRE to each special education student. (See 34 C.F.R. §§ 300.114, et seq.) A special education student must be educated with nondisabled peers "[t]o the maximum extent appropriate," and may be removed from the regular education environment only when the nature and severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (Ed. Code, §§ 56001, subd. (g), 56345, subd. (a)(5), 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2)(i), (ii).) A placement must foster maximum interaction between disabled students and their nondisabled peers "in a manner that is appropriate to the needs of both." (Ed. Code, § 56031; see also 20 U.S.C. § 1412 (a)(5)(A); *Rowley, supra,* 458 U.S. at p. 181, fn. 4; *Poolaw v. Bishop* (9th Cir. 1995) 67 F.3d 830, 834.)[24]

19.    When determining whether a placement is in the least restrictive environment (LRE), four factors must be evaluated and balanced: (1) the academic benefits of placement in a mainstream setting, with any supplementary paraprofessionals and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment. (*Ms. S. v. Vashon Island School Dist.* (9th Cir. 2003)

---

[24] The terms "regular education" and "general education" mean the same thing as it relates to the IDEA, and are often used interchangeably by the parties here.

337 F.3d 1115, 1136-1137; *Sacramento City Unified School District v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404 (hereafter, *Rachel H.*))

20.     As stated in Factual Finding 66, and based upon Conclusion of Law 17, Student has failed to meet her burden of showing that the SDC proposed did not meet her unique needs because the class was composed of students whose instructional needs were incompatible with those of Student. As stated in Factual Finding 67 and based upon Conclusion of Law 17, Student has also failed to meet her burden of proof that the methods of instruction in the proposed SDC class failed to meet her unique needs.

21.     However, as stated in Factual Findings 68 through 76, and based upon Conclusions of Law 17, 18, and 19, Student has met her burden of proof that the SDC class was not the LRE for her. Applying the four-factor analysis describe in the *Rachel H.* case, it is clear that Student could, at the very least, be satisfactorily educated in a general education classroom as long as she had aide support. There is little evidence that Student would not benefit from full inclusion in a general education setting. By the time Student's IEP meetings were held in May and June 2007, Student had spent almost an entire school year successfully progressing in her education at Hanna Fenichel. The only people who had consistently observed Student during that entire year – her mother, her preschool Director, and her ABA supervisor – all observed that Student was able to follow routines in the class, engage to some extent with her classmates, and generally benefit from her education. There was no evidence that Student was disruptive in class or that cost factors influenced the District's determination that its SDC was the proper placement for Student. As stated in Conclusion of Law 18, the IDEA, the California Education Code, and federal regulations place a heavy emphasis on educating special education students in the regular education environment, even if supports and accommodations are required. Removal of a special education child from the general education should occur only when the nature and severity of the child's disability prevents her from being educated satisfactorily in the general education environment.

22.     Certainly, as the cases cited in Conclusion of Law 18 note, full inclusion is not possible or practical for every special needs student. Student's experts acknowledge as much. Dr. Morrow runs an NPS in which he enrolls only special needs students. Ms. Korneder testified that she recommends SDC placement for students where appropriate. Dr. Bailey testified that she too would indicate if a SDC placement is appropriate; in fact, Dr. Bailey was herself a student in a SDC. However, in Student's case, she has persuasively shown that a SDC is not the LRE for her. Therefore, the District's offer of placement in its SDC substantively denied her a FAPE.

*Did the District's offer of placement in a District general education classroom for a portion of Student's school day deny her a FAPE because it is not an appropriate instructional setting for her and because the placement creates a school day that includes too many transitions between classroom settings?*

40

23.     As stated in Factual Findings 77 through 82, and based upon Conclusion of Law 17, the evidence supports Student's contention that the District's general education placement at its CDC was not appropriate for her. The District's expert consultant, Dr. Laura Schreibman, had observed the classroom and found that its composition of 24 students would overwhelm Student. Although a portion of class time that the District proposed Student spend in this class would only consist of 12 students, such was true for only approximately 45 minutes of the two hours Student would be in the class. Additionally, the true count of total potential peers with whom Student would have to interact in the class was actually closer to 30 than 24 since there were different students enrolled in the class on different days. The District's position that Student could navigate the CDC class is based on the observations and recommendations of its former school psychologist and present behavior specialist. However, the amount of time they observed Student at her private preschool only totaled three hours. Additionally, the setting at which they observed Student – the preschool class at Hanna Fenichel – was significantly different from the CDC class proposed by the District. Student's class at Hanna Fenichel was composed of only six to eight children and there were at least two adult instructors in the class, in addition to Student's one-on-one aide. Additionally, Student's mother had informed the IEP team at the IEP meeting in May 2007 that Student continued to be overwhelmed and show anxiety in large group settings. Therefore, the District's argument that this type of class would not overwhelm Student is not persuasive. The District's position that Student would not have difficulty in transitioning between multiple classroom settings is likewise not persuasive for the same reasons indicated above. Student therefore met her burden of proof that the District's CDC class was an inappropriate setting for her because it did not meet her unique needs, and therefore denied her a FAPE.

*Did the District's placement offer deny Student a FAPE because the District failed to provide staff capable of implementing the offer?*

24.     As determined in Factual Findings 83 and 84, and based upon Conclusions of Law 6 and 17, Student has failed to meet her burden of proof that District staff members were incapable of implementing any portion of the District's proposed offer. Instructors for each portion of the placement are trained professionals who take their jobs seriously. That Student's present ABA providers may be even better trained or supervised than District staff, or that her present providers may be more diligent in keeping records than do District staff, does not lead to the conclusion that District staff could not meet Student's educational needs.

*Are the District's assessments of Student with regard to her educational placement appropriate and, if not, is Student entitled to reimbursement from the District for the independent assessment conducted by Dr. Caroline Bailey?*

25.     Prior to making a determination of whether a child qualifies for special education services, a school district must assess the child. (20 U.S.C. § 1414(a), (b); Ed.

41

Code, §§ 56320, 56321.)[25] The request for an initial assessment to see if a child qualifies for special education and related services may be made by a parent of the child or by a state or local educational agency. (20 U.S.C. § 1414(a)(1)(B).) After the initial assessment, a school district must conduct a reassessment of the special education student not more frequently than once a year, but at least once every three years. (20 U.S.C. § 1414(a)(2)(B); Ed. Code, § 56381, subd. (a)(2).) A reassessment shall be conducted upon the request of a parent. (20 U.S.C. § 1414(a)(2)(A)(ii); Ed. Code, § 56381, subd. (a)(1).)

26.    School districts must perform assessments and reassessments according to strict statutory guidelines that prescribe both the content of the assessment and the qualifications of the assessor(s). The district must select and administer assessment materials in the student's native language and that are free of racial, cultural and sexual discrimination. (20 U.S.C. § 1414(b)(3)(A)(i); Ed. Code, § 56320, subd. (a).) The assessment materials must be valid and reliable for the purposes for which the assessments are used. (20 U.S.C. § 1414(b)(3)(A)(iii); Ed. Code, § 56320, subd. (b)(2).) They must also be sufficiently comprehensive and tailored to evaluate specific areas of educational need. (20 U.S.C. § 1414(b)(3)(C); Ed. Code, § 56320, subd. (c).) Trained, knowledgeable and competent district personnel must administer special education assessments. (20 U.S.C. § 1414(b)(3)(A)(iv); Ed. Code, §§ 56320, subd. (b)(3), 56322.) A credentialed school psychologist must administer psychological assessments and individually administered tests of intellectual or emotional functioning. (Ed. Code, §§ 56320, subd. (b)(3), 56324, subd. (a).) A school nurse or physician must administer a health assessment. (Ed. Code, § 56324, subd. (b).)

27.    In performing a reassessment, a school district must review existing assessment data, including information provided by the parents and observations by teachers and service providers. (20 U.S.C. § 1414(c)(1)(A); Ed. Code, § 56381, subd. (b)(1).) Based upon such review, the district must identify any additional information that is needed by the IEP team to determine the present levels of academic achievement and related developmental needs of the student and to decide whether modifications or additions in the child's special education program are needed. (20 U.S.C. § 1414(c)(1)(B); Ed. Code, § 56381, subd. (b)(2).) The district must perform assessments that are necessary to obtain such information concerning the student. (20 U.S.C. § 1414(c)(2); Ed. Code, § 56381, subd. (c).)

28.    The procedural safeguards of the IDEA provide that under certain conditions a student is entitled to obtain an IEE at public expense. (20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502 (a)(1); Ed. Code, § 56329, subd. (b) [incorporating 34 C.F.R. § 300.502 by reference]; Ed. Code, § 56506, subd. (c) [parent has the right to an IEE as set forth in Ed. Code, § 56329; see also 20 U.S.C. § 1415(d)(2) [requiring procedural safeguards notice to parents to include information about obtaining an IEE].) "Independent educational assessment means an assessment conducted by a qualified examiner who is not employed by

---

[25] The federal code uses the term "evaluation" instead of the term "assessment" used by California law, but the two terms have the same meaning for these purposes.

the public agency responsible for the education of the child in question." (34 C.F.R. § 300.502(a)(3)(i).)  To obtain an IEE, the student must disagree with an assessment obtained by the public agency and request an IEE.  (34 C.F.R. § 300.502(b)(1) & (b)(2).)

29.     The provision of an IEE is not automatic.  Code of Federal Regulations, title 34, part 300.502(b)(2), provides, in relevant part, that following the student's request for an IEE, the public agency must, without unnecessary delay, either:

(i) File a due process complaint to request a hearing to show that its assessment is appropriate; or

(ii) Ensure that an independent educational assessment is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the assessment obtained by the parent did not meet agency criteria.

(See also Ed. Code, § 56329, subd. (c) [providing that a public agency may initiate a due process hearing to show that its assessment was appropriate].)

30.     As stated in Factual Findings 85 through 95, and based upon Conclusions of Law 2 through 29, the weight of the evidence mitigates against a finding that the District's assessment process was inappropriate or that Student is entitled to reimbursement for the services of Dr. Bailey.  Except for its speech and language assessments and vision assessments, the District chose not to re-assess Student using formal, standardized tests in spring 2007.  The law does not require that it do so.  Rather, the District proposed an assessment plan that indicated that District staff would only conduct observations of Student in the areas of cognitive functioning, academic achievement, and social adaptive behavior. Student's mother signed the assessment plan; Student's parents have not asked the District to administer formal assessments.

31.     There are no specific statutory or regulatory standards for how observations, conducted as part of an assessment process, should be performed.  There is no guidance as to how long an observation should be, where it should take place, or how notes on the observation should be taken.  There is no requirement that a formal report of the observation be generated and, therefore, no standard for what such a report would contain or in what format it would be written.  Therefore, there is no basis for Student's contention that the District's observations did not comply with evaluation and reporting requirements.  No such standards exist.  In fact, the IEE obtained by Student did not include standardized tests either. Dr. Bailey's IEE consisted of observations of Student, review of her records, research, and the preparation of a report.  Dr. Bailey did not conduct any standardized tests of Student. Student's parents did not ask her to do so and she is not licensed to administer such tests. Nor did Dr. Bailey or Student's parents refer Student to another psychologist to administer standardized tests.  Student disagreed with what the District assessors observed and disagreed with their conclusions and recommendations concerning Student's placement. However, such disagreement does not support a contention that Student is legally entitled to

an IEE. The weight of the evidence therefore supports the District's contention that its assessments were proper and that Student is not entitled to reimbursement of her IEE at public expense.[26]

*Determination of Relief*

32.   The court has long recognized that equitable considerations are appropriate when fashioning relief for violations of the IDEA. (*Parents of Student W. v. Puyallup Sch. Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496 (hereafter *Puyallup School)*, citing *School Committee of Burlington v. Department of Education* (1985) 471 U.S. 359, 374 [105 S.Ct. 1996].) Compensatory education is an equitable remedy; it is not a contractual remedy. (*Puyallup School, supra*, 31 F.3d at p. 1497.) Relief is appropriate if it is designed to ensure that the student is appropriately educated within the meaning of the IDEA. (*Ibid.*) The award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.)

33.   A district may be required to reimburse a student's parents for the costs of a private school if the child previously received special education and related services from the district and the district failed to make a FAPE available to the child. (20 U.S.C. § 1412(a)(10) (C)(ii); 34 C.F.R. § 300.148(c); Ed. Code, § 56175.) Factors to be considered when determining the amount of reimbursement include the existence of other, more suitable placements, the effort expended by the parent in securing alternative placements and the general cooperative or uncooperative position of the school district. (*Target Range, supra*, 960 F.2d at p. 1487; *Glendale Unified Sch. Dist. v. Almasi*, (C.D. Cal. 2000) 122 F.Supp.2d 1093, 1109.)

34.   Additionally, a student is only entitled to reimbursement of private school tuition if it is determined that the placement at the private school was appropriate for the student. The placement does not have to meet the standard of a public school's offer of FAPE; it must, however, address the student's needs and provide educational benefit to him or her. (*Florence County School Dist. v. Carter* (1993) 510 U.S. 7, 13 [114 S.Ct. 361, 126 L.Ed.2d 284] (hereafter *Carter)*; *Alamo Heights Independent Sch. Dist. v. State Bd. of Education* (5th Cir. 1986) 790 F.2d 1153, 1161; 34 C.F.R. § 300.148.) Court decisions subsequent to *Burlington* have also extended relief in the form of compensatory education to students who have been denied a FAPE. (See, e.g., *Lester H. v. K. Gilhool and the Chester Upland School District* (3d Cir. 1990) 916 F.2d 865; *Miener v. State of Missouri* (8th Cir. 1986) 800 F.2d 749.) Compensatory education is an equitable remedy. There is no obligation to provide day-for-day or hour-for-hour compensation. "Appropriate relief is relief

---

[26] The ALJ notes that the bill for services tendered by Dr. Bailey is extraordinarily high. The ALJ reviewed a sampling of about 15 prior California administrative decisions in which the Student's parents requested reimbursement for an IEE. The ALJ did not find any reimbursement order for over $4,500.

designed to ensure that the Student is appropriately educated within the meaning of the IDEA." (*Puyallup School, supra,* 31 F.3d at p. 1497.)

35.     There is broad discretion to consider equitable factors when fashioning relief. (*Carter, supra,* 510 U.S. at p. 16.) The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Puyallup School, supra,* 31 F.3d at p. 1496.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

36.     Therefore, under appropriate circumstances, a court (and an ALJ) has the discretion to award prospective relief. However, in California, the Education Code limits the prospective relief that an ALJ may order. By statute, an ALJ may not render a decision that results in the placement of an individual with exceptional needs in a nonpublic, nonsectarian school, or that results in a service for an individual with exceptional needs provided by a nonpublic, nonsectarian agency, if the school or agency has not been certified by the State of California pursuant to the Education Code. (Ed. Code, § 56505.2, subd. (a).)

37.     Based upon Factual Findings 68 through 82 and 96 through 100 and Conclusions of Law 17, 18, 19, 21, 22, 23, and 32 through 36, Student is entitled to relief based upon the ALJ's finding that the District's offer of placement in its SDC and CDC general education classes denied Student a FAPE. Hanna Fenichel met the legal requirements of an appropriate placement for Student. Nor is there any evidence that Student's parents unduly failed to cooperate in the IEP process. Student's parents are thus entitled to reimbursement for the costs of tuition at Hanna Fenichel that they have already paid. Furthermore, as detailed above, since the evidence supports the contention of Student's mother that the school required payment of tuition in advance, Student's parents are entitled to the full amount of tuition they have paid, in the amount of $6,100.

38.     However, as noted in Conclusion of Law 37, California statute prohibits the ALJ from ordering that the District prospectively place Student at Hanna Fenichel and the ALJ is not making such an order now. The ALJ's order that the District reimburse Student's parents the full tuition they have paid for school year 2007-2008 is therefore not to be interpreted as an order for prospective placement of Student at Hanna Fenichel nor is it to be interpreted that Hanna Fenichel is the stayput for Student for any future purposes.

39.     Based upon the Factual Findings and Conclusions of Law in this Decision, Student is entitled to the provision of a one-on-one aide at school. As stated in Factual Finding 101, however, Student is not entitled to her choice of aide provider. Therefore, the ALJ orders that the District provide an appropriate aide to Student in her class at Hanna Fenichel. The aide shall be specifically trained in ABA principles and specifically trained to work with autistic children. Should the District decided to use an aide other than one from Coyne, the District will arrange for an IEP team meeting to determine an appropriate plan to transition Student from her Coyne aides to the aide(s) selected by the District.

40.     Based upon Factual Findings 85 through 95 and Conclusions of Law 2 through 31, Student's request for reimbursement for the cost of Dr. Bailey's services is denied.

41.     Finally, Student requests monetary compensation for her mother's time spent supplementing Student's in-home ABA program. Student's request is supported by neither the law nor the facts of this case. Student cites to no authority requiring a District to pay a parent a salary for educating his or her child at home. Student cites to one case, *Bucks County Department of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania* (3d Cir. 2004) 379 F.3d 61, in which a court awarded a parent monetary compensation for providing services to her child. However, that case was very unusual because the parent had specifically received training to become a service provider when she was unable to find another service provider to furnish services to her child. The court limited its holding to a situation in which "a trained service provider was not available...." (*Id.* at p. 75.) In this case, there is no question that appropriate service providers were available through the District or through NPAs such as Coyne. Additionally, the ALJ has found that Student did not require more than 10 hours a week of one-on-one ABA therapy in order to benefit from her education. Student's request that her mother be reimbursed for providing supplement ABA services is therefore denied.[27]

ORDER

1.     Within 30 days of this order, the District shall pay $6,100 to Student's parents to reimburse them for the costs of tuition they paid to the Hanna Fenichel School.

2.     Within 30 days of this order, the District shall provide a one-on-one aide to Student for the time she is enrolled at Hanna Fenichel, for the remainder of the 2007-2008 school year, including extended school year in the summer of 2008. If the District chooses not to contract with Coyne, the District shall arrange for an IEP meeting with Student's parents and the District team members to determine an appropriate plan for transitioning Student from her present Coyne aide(s) to the aide(s) selected by the District. The order to hold the IEP meeting if Coyne is not the selected provider does not affect the obligation of the District to begin providing one-on-one aide services to Student at Hanna Fenichel within 30 days of this order. The District shall also provide a minimum of one hour a week of supervision for the one-on-one aide, either through its own staff of the NPA of the District's choice.

---

[27] Student has not provided any other evidence of costs expended by her parents for Coyne services. She has therefore failed to show entitlement to any reimbursement other than that ordered here. Furthermore, since the ALJ has found that District staff is competent to provide ABA services, Student is not entitled to reimbursement for the costs of her Coyne one-on-one aide at school.

3.    If Student wishes to receive intensive ABA services from the District, she must agree to the 10 hours of ABA services at the District school site, as offered in the June 13, 2007 IEP.

4.    Student's other requests for relief are denied.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter. Pursuant to this mandate, it is determined that the Student substantially prevailed on Issue 1(D) and fully prevailed on Issue 1(E). The District fully prevailed on Issues 1(A), 1(B), 1(C), 1(F), and Issue 2. The District minimally prevailed on Issue 1(D).

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by this Decision. Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED: January 7, 2008


DARRELL L. LEPKOWSKY
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

47

# EXHIBIT B

## Current Placement

8:45-12:15  (5 days)
Community Preschool Setting—Hanna Fenichel
w/ Ms. Jen, Shannon, & Nancy

**Lunch/ Outdoor Play**

**Total # Physical Environments/school day
(excluding playground):  1
# Transitions during school day: 2
Total # Peers/ wk: 14
Total # Staff Changes during school day: 0
Minutes/wk in full inclusion classroom: 1,050
Teacher:Student Ratio in inclusive classroom: <1:5**

Speech w/ Ms. Ryder (No Pullout)
45-60 mins. Indiv./Group (3 days)

2-3 hours In-Home ABA
w/ Coyne & Assoc. staff or Parent
(5 days)



## Proposed District Placement



8:45-10:45 (4 days) Severely Handicapped
Preschool SDC w/ Ms. Gomez

Speech Pullout w/ Ms. Ryder
45-60 mins. Indiv./Group (3 days)

Recess/Snack

10:45-12:45 (4 days)
CDC General Ed. Preschool w/ Ms.Gallagher
(incl. Recess & Lunch)

Lunch

12:45-2:45  Severely Handicapped
Preschool  SDC w/ Unknown staff for 1:1 IBI

**Total # Physical Environments/school day (excluding playground):  4**
**# Transitions during school day: 6**
**Total # Peers/wk: up to 38\*\***
**Total # Staff Changes during school day: 4**
**Minutes/wk in full inclusion classroom: 480**
**Teacher: Student Ratio in inclusive classroom: 1:12**

**\*\*Testimony from SBSD employees revealed that this number was actually 42 peers per
DAY and even more per week.  The ALJ used and referred to this larger, more accurate
number in writing her decision.**

# EXHIBIT C

1  Maureen R. Graves, Esq. (SBN 145979)
   John G. Nolte, Esq. (SBN 233966)
2  34 Schubert Court
   Irvine, CA 92617
3  Phone: 949-856-0128
   Fax: 949-856-0168
4  maureen@maureengraves.com
5  john@maureengraves.com
   Attorney for Plaintiffs
6  KA.D., a minor, by her mother,
   KY.D., as her next friend;
7  KY.D.; and B.D.

8                    **UNITED STATES DISTRICT COURT**
                     **SOUTHERN DISTRICT OF CALIFORNIA**
9

10  KA.D., a minor, by her mother, KY.D., as her    )  Civil No.   08-cv-00622-W (POR)
    next friend; KY.D.; and B.D.;                    )  DECLARATION OF KY.D.
11                                       Plaintiffs,  )
                                                      )  27 April 2009
    vs.                                               )
12  SOLANA BEACH SCHOOL DISTRICT,                     )
                                        Defendant.    )
13                                                    )
                                                      )
14                                                    )
                                                      )
15                                                    )
                                                      )
16  SOLANA BEACH SCHOOL DISTRICT                      )
                                                      )
17                                   Counterclaimant, )
    vs.                                               )
18  KA.D., a minor, by her mother, KY.D., as her     )
    next friend; KY.D.; and B.D.;                     )
19                                Counter Defendants. )
                                                      )
20                                                    )
                                                      )
21                                                    )
                                                      )
22                                                    )

23        The following declaration is based upon my own personal knowledge and experiences,

24  documentation from various sources including Solana Beach School District (SBSD), Coyne and

25  Associates (Coyne), and Office of Administrative Hearings (OAH).  Its contents are true to the best

26  of my knowledge and I would be willing to testify thereto as a witness.

27        1.        On January 7, 2008 our family received an OAH decision written by Judge Darrell

28  Lepkowski which affirmed our daughter, KA.D.'s, right to continue to be educated to the maximum

                                              1
                                                                          08-cv-00622-W (POR)

1    extent appropiriate alongside her non-disabled peers at Hanna Fenichel Center, a preschool near our

2    home and within the boundaries of SBSD.  It also affirmed KA.D.'s ongoing need for 1:1 support at

3    Hanna Fenichel by an aide skilled in Applied Behavior Analysis (ABA) in order to receive a free

4    appropriate public education (FAPE).

5        2.    However, the decision did not require, or make any provisions for these necessary

6    aide support services from the date of the decision until 30 days after the decision when the SBSD

7    was then required to either begin funding Coyne and Associates services or provide services

8    with their own staff or another suitable non-public agency (NPA).

9        3.    Up until that point, our family had continued to work with our military insurance and

10   the San Diego Regional Center (SDRC) in order to arrange the provision of 1:1 aide support at

11   Hanna Fenichel through Coyne.  However, through mechanisms which I am barred

12   by confidentiality from disclosing, we were able to have these services funded through January 31,

13   2008 but not thereafter, leaving several days of aide support unfunded during this potential "gap" in

14   services.

15       4.    Because the ALJ had determined that this support was necessary in order for KA.D.

16   to receive a FAPE, we attempted to avoid having this gap and went to great lengths to try to remedy

17   the situation prior to its occurence.

18       5.    On January 11, 2008, through our attorney, we made a motion to request clarification

19   of Judge Lepkowski's decision, believing that this gap in FAPE had been an oversight or that her

20   intent had not been clear in the decision.  On January 15, 2008 SBSD, through its counsel, filed

21   a response to our motion in opposition.

22       6.    On January 25, 2008 Judge Lepkowski ruled that indeed, she had intended to give the

23   District 30 days to begin the provision of services required for KA.D. to receive FAPE, though she

24   did not indicate who was responsible for the provision of FAPE during this time.  As a result, this

25   expense would either fall on our family, or KA.D. would have to go without the services she

26   needed to attend school after January 31st, when our previous arrangements expired.

27       7.    On January 28, 2008 our family made a last-ditch attempt to avoid these additional

28   expenses by writing, through our counsel, to the California Department of Education, the

1    Department of Developmental Services, and the San Diego Regional Center in order to

2    request funding during this gap in services created by Judge Lepkowski's order and SBSD's

3    decision not to provide them until the last possible moment before it was required. We received no

4    assistance from any of the agencies named above.

5          8.    On February 4, 2008 the District held an IEP at which it announced its intent to

6    replace KA.D.'s aide support through Coyne and Associates with its own staff. It did not, however,

7    invite any representatives from Coyne and Associates to give input on how this transition might

8    occur or to receive any input from them in regards to her present levels of performance, her

9    progress on current goals, or to describe the motivational systems and behavior management

10   techniques which it had been successfully using with KA.D. in the classroom.

11         9.    At this meeting I requested that the another IEP meeting be called so that Coyne and

12   Associates, as her then-current service providers, could participate in the development of the

13   transition plan and give input in the development of the IEP which would reflect the changes in

14   KA.D.s services. Ms. Mary Ellen Nest, SBSD's Director of Special Education and Pupil Services,

15   responded to this request verbally at the IEP meeting and later in a letter which stated that the

16   District would not pay for Coyne and Associates staff to attend an IEP meeting and that if I were to

17   invite them, it would be at our family's expense.

18         10.   Realizing that the District was not going to facilitate Coyne's participation in the

19   transition, I consented to the proposed services two days later, on February 6, 2008. District staff

20   began overlap training at Hanna Fenichel on February 11, 2008. I received an invoice from Coyne

21   and Associates dated February 15, 2008 for 14 hours of aide support services from the beginning of

22   February, prior to the District beginning overlap services, in the amount of $700.00. I paid this

23   amount in full by check on February 28, 2008; I have attached the invoice reflecting  this payment

24   with my declaration. While this amount may seem relatively small, it represented nearly half (46%)

25   of our family's weekly take-home pay at that time. We were still under financial obligations to our

26   attorney and to Dr. Caroline Bailey for her Independent Education Evaluation (IEE); and while Dr.

27   Bailey had since agreed to significantly reduce her fee [to $12,000], these and other educationally

28   related expenses had emptied our savings account and forced us to use credit cards to pursue a due

1   process hearing to protect KA.D.'s rights to an appropriate education.   At the time, this additional

2   expense was not only a hardship financially, but emotionally added insult to injury--having won a

3   decision which affirmed KA.D.'s right to be educated with appropriate supports in her general

4   education preschool, we were still having to pay out of pocket for it.

5         11.    I declare under penalty of perjury under California and federal law that the foregoing

6   is true and correct.

7

8   Dated: April 27, 2009

9   KA.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 3:08-cv-00622-W-WVG   Document 29   Filed 04/27/09   PageID.375   Page 87 of 89

# Invoice

**Coyne & Associates Education Corp**

Tax ID#: 58-2675894

P.O. Box 231831

Encinitas, CA  92023

| Date | Inv # |
|------|-------|
| 02/15/08 | SCH0108KD |

| SERVICE MONTH |
|---------------|
| Feb-08 |

| BILL TO: |
|----------|

Kyla Doyle

Private Pay

704 Sonrisa

Solana Beach, CA  92075

| DATE | CLIENT | UCI | | SERVICE | HOURS | RATE | AMOUNT |
|------|--------|-----|--|---------|-------|------|--------|
| 02/01/08 | Doyle , Kathryn | 6251440 | SBSD | Direct 1:1 Instruction | 3.50 | | |
| 02/04/08 | Doyle , Kathryn | 6251440 | SBSD | Direct 1:1 Instruction | 3.50 | | |
| 02/06/08 | Doyle , Kathryn | 6251440 | SBSD | Direct 1:1 Instruction | 3.50 | | |
| 02/08/08 | Doyle , Kathryn | 6251440 | SBSD | Direct 1:1 Instruction | 3.50 | | |
| **Total** | | | | | 14.00 | $ 50.00 | $    700.00 |

2430
2/28/08



*Caroline E. Bailey, Ph.D.*
*Educational Consultant*
1132 12th Street #9
Santa Monica, CA 90403
323-972-1559

## K██ D██ Independent Educational Evaluation

| Service Rendered | Date(s) of Service | Hourly Fee | Hours | Total Fee |
|---|---|---|---|---|
| Child Observation | September 28, 2007<br>October 1, 2007<br>November 18, 2007 | $300.00 | 15 | $4500.00 |
| Review of Records | | $300.00 | 25 | $7500.00 |
| Research | | $300.00 | 10 | $3000.00 |
| Written Report | October 11, 2007 | $300.00 | 20 | $6000.00 |
| Written Report | pending | $300.00 | 10 | $3000.00 |
| IEP | pending | $300.00 | 3 (est) | $ 900.00 |
| Client Communication | | --- | 15 | --- |
| Travel Time | | --- | 8 | --- |
| | | | | **Total Fee:**<br>**$24,900.00** |

## CERTIFICATE OF SERVICE
## STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to the within action; my business address is 34 Schubert Court, Irvine, California, 92617.

On **4/27/09**, I served the foregoing documents described as **Plaintiffs' Request that Administrative Decision be in Part Sustained and in Part Reversed & Exhibits Thereto; Certificate of Service** on the interested parties in this action **[X]** by placing [ ] the original [ ] a true copy thereof enclosed in a sealed envelope addressed as stated below:

**[ ]     BY MAIL**

[ ] I deposited such envelopes in the mail at **Irvine, California**.

[X] I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that, on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**[X]     BY CM/CEF ONLY**

[ ] I faxed on this date the above document to the parties listed below:

**[X]   (State)**  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**[X]   (Federal)**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **4/27/09** at Irvine, California.

<u>  S/MAUREEN GRAVES</u>
MAUREEN GRAVES, ESQ.